Margaret T. WHITE, Plaintiff–
Appellee,

v.

SUN LIFE ASSURANCE COMPANY
OF CANADA, Defendant–
Appellant,

and

Greer Laboratories, Incorporated; Greer Laboratories, Incorporated Employee Long Term Disability Plan; Plan Administrator of the Greer Laboratories, Incorporated Long Term Disability Plan, Defendants.

Margaret T. White, Plaintiff–Appellee,

v.

Sun Life Assurance Company
of Canada, Defendant–
Appellant,

and

Greer Laboratories, Incorporated; Greer Laboratories, Incorporated Employee Long Term Disability Plan; Plan Administrator of the Greer Laboratories, Incorporated Long Term Disability Plan, Defendants.

Nos. 06–1285, 06–1491.

United States Court of Appeals,
Fourth Circuit.

Argued: Dec. 1, 2006.

Decided: April 26, 2007.

**ARGUED:** Mark Eugene Schmidtke, Schmidtke Hoeppner Consultants, L.L.P., Valparaiso, Indiana, for Appellant. Charles McBrayer Sasser, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Anuja G. Purohit, Poyner & Spruill, Raleigh, North Carolina, for Appellant. Thomas L. Hudson, Osborn Maledon, P.A., Phoenix, Arizona, for Appellee.

Before WILKINS, Chief Judge, WILKINSON, Circuit Judge, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge WILKINSON wrote the majority opinion, in which Judge FLOYD joined. Chief Judge WILKINS wrote a dissenting opinion.

## OPINION

WILKINSON, Circuit Judge:

This case requires us to determine whether a benefit plan can start the statute of limitations running on a plan participant's cause of action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* (2000), before the plan participant can even file suit. Plaintiff-appellee Margaret T. White brought suit against defendant-appellant Sun Life Assurance Company of Canada "to recover benefits due to [her] under the terms of [her] plan" for disability insurance. 29 U.S.C. § 1132(a)(1)(B). Sun Life seeks to bar this federal claim based upon a provision in the plan's governing document stating, "No legal action may start . . . more than 3 years after the time Proof of Claim is required." A plan participant applies for benefits by filing a proof of claim, but she may not bring a legal action until her plan has reached a final decision denying benefits.

We agree with the district court that ERISA's remedies framework does not permit a plan to start the clock on a claimant's cause of action before the claimant may file suit. We also agree that Sun Life erred in denying White disability benefits, and therefore affirm the decision below.

### I.

#### A.

Plaintiff Margaret White received long-term disability insurance from Sun Life under a plan provided through her family's business, Greer Laboratories, Inc., where she worked from 1984 until 2000. White resigned on February 11, 2000 from the position of vice president of administration, in which her duties had included coordinating the work of staff, reviewing subordinates' work, and attending management meetings.

After leaving Greer Laboratories, White filed an application for disability benefits with Sun Life, claiming total disability. Sun Life's provision for total disability provides monthly payments to a covered employee who "because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation." The policy defines "Injury" as "bodily impairment resulting directly from an accident and independently of all other causes" and "Sickness" as "illness, disease or pregnancy."

White based her claim upon chronic pain from piriformis syndrome, a neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve. White reported that she experienced lower back pain radiating down her right leg after performing household labor in August of 1997, and that this evolved into a chronic pain and, over time, moved to her left leg.

In 1997, White sought help from Dr. David Jones, a board-certified neurosurgeon. She began to see a pain management specialist, Dr. Felicia Cain, the following year. The doctors were unable to pinpoint the source of White's pain, despite diagnostic steps such as an MRI scan, CT scan, and myelogram. White was prescribed pain medication and muscle relaxants, but she reported that her pain worsened despite these treatments.

Dr. Jones referred White for a surgical consultation with David Kline, chairman of the neurosurgery department at Louisiana State University, whom Dr. Jones described as "a nationally recognized expert

in the surgical treatment of peripheral nerve disorders." Dr. Kline warned White that surgery would not necessarily be a cure, describing "the possibility of not helping, and the possibility of deficits." White chose to undergo surgery nonetheless on April 21, 1999. Dr. Kline wrote that the surgery revealed a serious physical abnormality. The piriformis muscle "was quite deformed and tethering the peroneal nerve division, which it had split, and was running in between." Dr. Kline resectioned the piriformis muscle and removed tissue from around the sciatic nerve.

After surgery, White reported initial improvement in June and early July of 1999. By July 23, however, she was again reporting significant pain as well as depression. Dr. Cain wrote that day that "[p]iriformis syndrome [was] still causing the patient a great deal of pain," and that White had "an extreme amount of depression secondary to her inability to do anything and pain and inability to sleep." She increased White's dosages of a painkiller and an antidepressant, and had White sign a narcotics contract regarding her use of the medications.

White's July appointment with Dr. Cain was not the only occasion on which a doctor observed that the claimant suffered from depression. Dr. Cain diagnosed depression again on September 22, 1999, for instance, and wrote that White suffered from "problems at work as well as at home secondary to pain and its limitations on her life." Dr. David Abernathy, a longtime physician of White's, wrote during the summer after White's surgery that he did not "see a way around" White's medications. "Maggie complains of a lot of pain that is seemingly not understood according to her by her family," he noted. "She is in an executive position in a company here that is family owned and has been given almost some ultimatums about leaving the company."

Both Dr. Jones and Dr. Cain wrote that the patient was still struggling with pain in the summer and fall. While White had gradually returned to work and was working five days a week in October of 1999, Dr. Jones wrote in October that the patient was "going to cut back to 3 days a week beginning soon" and added, "I think this would help her." He wrote that the patient "continues to take fairly hefty doses" of pain medicines under the supervision of Dr. Cain but that White "has managed very well with this" and was adhering to her narcotic contract with Dr. Cain. Nevertheless, White told Dr. Cain on February 3, 2000 that she was unable to sit for any length of time, and that the only way she could relieve pain was to lie on her right side. Dr. Cain added, "[A]lthough she continues to try to function in a full-time capacity, she feels this is becoming intolerable secondary to pain."

White left work that month, on February 11. She continued to see her doctors after leaving Greer Laboratories, and Sun Life relies heavily on a letter generated during one such visit as supporting its denial of benefits. Dr. Kline wrote to Dr. Jones on March 20, 2000, after seeing White for a follow-up appointment:

She has had inexplicable buttock level pain and sciatica for a number of years . . . [A]fter some relief of her pain in the buttock, it has come back. She also has some low back pain and some pain occasionally on the anterior side of the thigh. It occasionally goes all the way to the calf. She has stopped her work, but that is more because of familial problems and work problems than her disability and difficulty with her back and leg. She is tender in the low back, particularly to the left . . . She has decreased range of motion to the back,

particularly full flexion. Straight leg raising gives mainly low back rather than buttock or leg pain. This is so also with reverse straight leg raising.

Dr. Kline described White's "sciatic function" on the right and left sides as "excellent ... grading 5/5." He wrote, "I think pain management we will leave in your hands," but recommended swimming and physical therapy exercises. "We will see her again in six months and only wish there was more we could do for her," Dr. Kline wrote.

Dr. Jones spoke with White via phone on March 28, leading him to write that White "continues to be miserable. She is considering applying for long term disability, and at this point I think that is probably the only option left to her." Dr. Jones also noted that White had undergone another MRI scan, which showed "no change" from the scan before surgery in 1998.

Dr. Cain wrote that month that White's pain had worsened since surgery and that the patient still required large doses of pain medications and was experiencing "a great deal of distress secondary to this illness." She suggested White seek treatment for depression, which White declined because she did not believe it would help. Dr. Cain increased White's dosage of pain medication on that visit, and White reported an improvement in her condition in April, when Dr. Cain wrote that the patient "appears to have seen an increase in her affect as well as decrease in depression" since leaving her job. White described similar levels of pain during the summer of 2000, but Dr. Cain wrote that White was still only "able to be active 2–3 hours per day and then must rest in order to decrease pain."

## B.

White applied for long-term disability benefits in an application dated May 5, 2000. Dr. Jones stated in support of White's application that since February 18, 2000, she had been completely unable to work given her physical limitations, would never be able to work, and was not capable of performing another occupation on a full or part-time basis.

Sun Life's claims consultant recommended that a physician-consultant, Dr. Sarni, review White's file. She stated that "[a] doctor to doctor call may be helpful" in the review. Dr. Sarni did not consult any of White's treating physicians, however, nor did he or any other physician examine White on behalf of the insurer, as Sun Life was entitled to do under its plan. Instead, Dr. Sarni drafted a brief memorandum containing broad assertions about the appropriateness of the plaintiff's treatment given her condition—assertions that had not been made by either of the neurosurgeons or the pain specialist who treated White over an extended period.

Dr. Sarni described White's regimen of painkillers and her prescription for the muscle relaxant Valium, in addition to quoting Dr. Kline's March 20, 2000 report stating that White stopped work "more because of familial problems and work problems than her disability." Dr. Sarni then wrote: "These are extremely high doses of very addictive medication. All of this medication also goes to reset the pain threshold. Such pain complaints are far out of proportion to the pathology described. There is no objective data at this point to support such significant impairments."

Sun Life denied White's claim. White appealed in October of 2000 and submitted additional medical records, as well as a new letter from the neurosurgeon Dr. Jones explaining his conclusion that White was "disabled from performing any work on a continued and sustained basis due to her ongoing symptoms of chronic pain that

have arisen from her peripheral nerve disorder," and had been disabled "since at least February, 2000."

Sun Life again referred White's file to Dr. Sarni, who dismissed Dr. Jones' conclusions in another one-page letter. Dr. Sarni asserted that Dr. Jones' conclusions were in "direct contradiction" to the March 20, 2000 follow-up letter from Dr. Kline, although Dr. Kline had not questioned Dr. Jones' conclusions in his letter and Dr. Sarni had communicated with neither Dr. Kline nor Dr. Jones nor any other treating physician. Sun Life also submitted White's file to a vocational consultant. The consultant echoed Dr. Sarni's interpretation of Dr. Kline's report as indicating that family problems were the source of White's inability to perform her work responsibilities and concluded, "It is not clear to me what specifically precludes her from doing her sedentary job." Sun Life informed White that her appeal had been denied in a letter dated March 28, 2001.

White filed suit under ERISA on March 26, 2004, seeking benefits under the terms of Sun Life's disability plan.[1] Sun Life sought to dismiss White's ERISA claim on the grounds that it was time-barred as a result of the provision in Sun Life's plan stating that the statute of limitations began to run at an earlier date than federal law would ordinarily provide. The district court found this plan provision was contrary to ERISA's statutory scheme, and later determined that Sun Life's denial of disability benefits had been an abuse of discretion. Sun Life now appeals.

## II.

### A.

Sun Life first contends that White's complaint should be deemed untimely.

This is not a result dictated by the language of ERISA itself: Like many federal laws, the cause of action for benefits due under an ERISA plan does not contain a statute of limitations, nor does it specify when the statute begins to run. *See* 29 U.S.C. § 1132(a)(1)(B) (2000). As a default, courts faced with such omissions borrow the state law limitations period applicable to claims most closely corresponding to the federal cause of action, *see Wilson v. Garcia,* 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), but treat the time at which the statute begins to run as governed by a uniform federal rule rather than the laws of the states, *see Rawlings v. Ray,* 312 U.S. 96, 97–98, 61 S.Ct. 473, 85 L.Ed. 605 (1941); *Blanck v. McKeen,* 707 F.2d 817, 819 (4th Cir.1983). The clock generally begins to run at the time a plaintiff can first file suit. "While it is theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit," the Supreme Court has written, "we will not infer such an odd result in the absence of any such indication in the statute." *Reiter v. Cooper,* 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Thus, *Reiter* held that payment of a tariff was not a prerequisite to litigating the tariff's reasonableness under the Interstate Commerce Act, notwithstanding a prior Supreme Court decision suggesting otherwise, on the grounds that Congress' subsequent change to the accrual date should be understood to control both for statute of limitations purposes and for the purpose of determining when a claim could be brought. *Id.*

---

1. White also raised state law claims that the district court held were pre-empted by ERISA, a decision that White does not appeal.

**246**

The ERISA accrual rule we have set forth based upon these principles is plain and unconditional, and Sun Life does not dispute that its application would make the plaintiff's complaint timely. We have held: "An ERISA cause of action does not accrue until a claim of benefits has been made and formally denied." *Rodriguez v. MEBA Pension Trust,* 872 F.2d 69, 72 (4th Cir.1989). Other circuits have adopted this same accrual rule for ERISA actions. *See Hall v. Nat'l Gypsum Co.,* 105 F.3d 225, 230 (5th Cir.1997); *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 66–67 (7th Cir.1996); *Stevens v. Employer–Teamsters Joint Council No. 84 Pension Fund,* 979 F.2d 444, 451 (6th Cir.1992); *Martin v. Construction Laborers Pension Trust for S. Cal.,* 947 F.2d 1381, 1386 (9th Cir.1991); *Mason v. Aetna Life Ins. Co.,* 901 F.2d 662, 664 (8th Cir. 1990). This means that the statute of limitations begins to run at the moment when the plaintiff may seek judicial review, because ERISA plaintiffs must generally exhaust administrative remedies before seeking judicial relief. *See Makar v. Health Care Corp. of the Mid–Atlantic (Carefirst),* 872 F.2d 80, 81 (4th Cir.1989).

Sun Life asks us, however, to disregard all the usual rules of accrual and to hold that ERISA plans may specify different accrual dates in their governing documents. It relies in large part upon a contracting case preceding the enactment of ERISA, which stated that "in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period." *Order of United Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 608, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947). The Supreme Court did not dis-cuss or have before it in *Wolfe* a provision such as Sun Life's that set potential plaintiffs' limitations periods running before they could even file suit. And as the dissent acknowledges, *see post* at 257–58, ERISA plans are not classical commercial contracts of the sort at issue in *Wolfe.* To be sure, ERISA does confer upon plans substantial power to set their terms: We have held that "[p]lan sponsors, not federal courts, are empowered by ERISA 'to adopt, modify, or terminate welfare plans,'" and we reaffirm "the well-established principle that plans can craft their governing principles as they think best." *Gayle v. United Parcel Service, Inc.,* 401 F.3d 222, 228 (4th Cir.2005) (quoting *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)).

This principle is not boundless, however. Even setting aside the differences between the contract in *Wolfe* and an ERISA plan containing an accrual provision such as Sun Life's, we cannot enforce the provision. Parties may establish such accrual provisions only "in the absence of a controlling statute to the contrary," *Wolfe,* 331 U.S. at 608, 67 S.Ct. 1355, and the accrual provision in the plan flies in the face of the ERISA statutory framework. Moreover, the endless judicial "reasonableness" oversight that the dissent would enlist to save the accrual provision immerses courts in an extra-contractual and extra-statutory endeavor that is incompatible with ERISA's written-plan requirement.

### B.

The first barrier to Sun Life's accrual provision is the remedies framework established by the ERISA statute. ERISA imposes limits on plan autonomy through substantive and procedural requirements intended to protect "the inter-

ests of participants in employee benefit plans and their beneficiaries" and provide "for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b) (2000). Plan drafters enjoy broad latitude, but they cannot write over the constraints established by federal law.

Sun Life would do just that by starting the clock on its participants' claims before the participants can even file suit. The company's accrual provision runs afoul of the statute's scheme of mutually reinforcing remedies by using the internal review mechanisms mandated by ERISA in a manner that undermines and potentially eliminates the ERISA civil right of action. Internal appeals are one cornerstone of ERISA: The statute requires that "every employee benefit plan shall—afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). But judicial review is another: When internal review mechanisms do not resolve a dispute over benefits, a plan participant may challenge the plan's decision in court. *See* 29 U.S.C. § 1132(a); *Varity Corp. v. Howe,* 516 U.S. 489, 513, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that ERISA's stated objective of providing "ready access to the Federal courts" disfavors interpretation of statute that would strip beneficiaries of ability to file suit).

These remedies must be interpreted in light of each other. Thus, although ERISA does not explicitly state that claimants must exhaust internal appeals before filing suit, courts have universally found an exhaustion requirement in part because statutory text and structure establish these twin remedies of administrative and judicial review as parts of a single scheme. *See Makar,* 872 F.2d at 82–83; *see also Whitehead v. Okla. Gas & Elec. Co.,* 187 F.3d 1184, 1190 (10th Cir.1999) (holding that ERISA requires exhaustion for benefits claims); *Springer v. Wal–Mart Assocs.' Group Health Plan,* 908 F.2d 897, 899 (11th Cir.1990) (same); *Miller v. Metro. Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991) (same); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990); *Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199 (2d Cir.1989) (same); *Drinkwater v. Metro. Life Ins. Co.,* 846 F.2d 821, 825–26 (1st Cir.1988) (same); *Denton v. First Nat'l Bank of Waco, Tex.,* 765 F.2d 1295, 1297 (5th Cir.1985) (same), *reh'g denied,* 772 F.2d 904 (5th Cir.1985); *Kross v. W. Elec. Co.,* 701 F.2d 1238, 1244–45 (7th Cir.1983) (holding district court has discretion to require exhaustion and ERISA statute favors doing so); *Amato v. Bernard,* 618 F.2d 559, 566–68 (9th Cir.1980) (same).[2]

This interlocking remedial structure does not permit an ERISA plan to start the clock ticking on civil claims while the plan is still considering internal appeals. Courts have required exhaustion in light of the symbiotic relationship between ERISA civil suits and internal review, but Sun Life would allow one remedy to undercut the other. Benefit plans would have the incentive to delay the resolution of their participants' claims, because every day the plan took for its decision-making would be one day less that a claimant would have to

---

2. The symbiotic nature of ERISA remedies is also evident in regulations concerning the notice that ERISA plans must provide to claimants upon denial of benefit claims as part of the plan's obligations with respect to "full and fair review." The civil action is treated as an integral part of this review: plans are direct-ed to include a "description of the plan's review procedures and the time limits applicable to such procedures, *including a statement of the claimant's right to bring a civil action*" following an adverse benefits determination. 29 C.F.R. § 2560.503.1(g)(iv) (emphasis added).

review the plan's final decision, decide whether to challenge it in court, and prepare a civil action if need be. Indeed, a plan that did not reach a final decision until after the statute of limitations had run would deprive a participant of the right to file a civil claim at all. These incentives to delay would undermine internal appeals processes as mechanisms for "full and fair review," *see* 29 U.S.C. § 1133(2), and undermine the civil right of action as a complement to internal review, *see Varity*, 516 U.S. at 513, 116 S.Ct. 1065 (noting ERISA is designed to develop "a sensible administrative system").

## C.

Sun Life acknowledges that its rule creates tension between internal and judicial review requirements, but it proposes to resolve these tensions through case-by-case review of the "reasonableness" of the time allotted a claimant to file suit. But this approach is also sharply at odds with ERISA.

Sun Life does not dispute that across-the-board enforcement of its own accrual provision would be inconsistent with ERISA's scheme of remedies, given the difficulty of allowing plans to deprive their participants of any or virtually any time in which to file civil suit. Every claimant covered by an accrual provision such as Sun Life's would have less than the full limitations period available to file suit, and Sun Life acknowledges that a plan's prolonged deliberations could in some cases deprive claimants of a reasonable opportunity to file their civil actions. Sun Life urges us, however, to assess the reasonableness of this compression on a case-by-case basis: "If the limitations period, including the accrual date, is unreasonable, then a different limitations period should apply." Reply Brief of Appellant at 7–8. The insurer argues that its accrual provi-

sion should be enforced on the grounds that undue delay or abuse of internal appeals were "not the circumstances in the present case," because Sun Life decided White's benefits claim with more than two years remaining on the statute of limitations that the plan sets forth. Brief of Appellant at 40.

Whatever the "reasonableness" of the time available to this particular claimant, Sun Life's approach provides no basis for a workable rule. Indeed, a case-by-case approach to contractual accrual provisions creates as many problems as it would solve. It would be simple to disregard plan-specified accrual dates when a plan took so long to make a final benefits determination that a claimant was left with no time at all in which to file suit. But courts would have no ready means of determining, as Sun Life proposes, how much "compressing" of the plaintiff's limitations period was too "severe [ ]." Brief of Appellant at 40 (quoting district court opinion). These questions could not be answered by an analysis of the plan document alone, because whether an accrual provision was "reasonable" with respect to a particular claimant would change each day that the plan did not issue a final decision. Moreover, while a case-by-case approach might give courts a means to intervene in egregious cases, it would not eliminate the perverse incentives to delay the resolution of claims. Courts would be hard pressed to ascertain whether these incentives caused a plan to delay a decision, despite the way in which such manipulation of the internal review process undermines both ERISA's civil remedy and internal appeals as mechanisms of "full and fair review."

Perhaps most importantly, the manner in which Sun Life proposes to reconcile internal and judicial review would come at the expense of ERISA's "written plan" and participant-notification requirements, as

well as the values of notice and certainty that these requirements serve. ERISA affords plans broad powers over substance and procedure, but it requires that plans act through written documents, stating, "Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The Supreme Court has described this as a "core functional requirement[ ]" that aims to ensure that "every employee may, *on examining the plan documents*, determine exactly what his rights and obligations are under the plan." *Curtiss–Wright Corp.*, 514 U.S. at 83, 115 S.Ct. 1223. Plans must also provide participants with written notification if they deny benefits, describing "the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action," 29 C.F.R. § 2560.503–1(g)(iv), written "in a manner calculated to be understood by the claimant," *id.* § 2560.503–1(g); *see also* 29 U.S.C. § 1133(1) (setting forth statutory notice requirement).

A sometimes-enforcing approach to accrual provisions would disregard the written plan requirement and make it impossible for plans to give their participants the notice of subsequent remedies required by law. The "reasonable[ness]," "severe[ ] compress[ion]" or "ample time," rule that Sun Life seeks to have enforced is nowhere contained in its written plan. Brief of Appellant at 40; Reply Brief of Appellant at 6. Contractual accrual periods like Sun Life's would be enforced sometimes, but not at other times, according to a standard neither contained in the plan document nor evident from its terms. *Cf. United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir.1998) ("ensur[ing] the integrity of written, bargained-for benefit plans" requires that "the plain language of an ERISA plan must be enforced in accor-dance with 'its literal and natural meaning' ") (internal citation omitted).

Rather than apprising plan participants of their rights, the written plan would often mislead claimants by setting forth a purported time limitation that would, in reality, apply only if it satisfied a reasonableness analysis described nowhere in the plan. Some claimants might conclude the permissible time had passed and not pursue their claim; others might conclude that it was not worth the effort to litigate a threshold inquiry into reasonableness. Whatever the effects, reasonableness is a subjective standard whose application to a particular claimant would shift over time. As a result, neither a plan participant nor even a court could determine at the moment that a participant filed proof of claim whether his legal cause of action would accrue as provided under the plan's terms.

Sun Life insists that declining to enforce this accrual and limitations provision would amount to holding that "the express federal statutory mandate that ERISA plans should be enforced according to their terms is somehow trumped by a federal common law principle." Reply Brief of Appellant at 1. But it is Sun Life's position that relies on standards nowhere mentioned in the plan and it is Sun Life's position that immerses federal courts in a federal common law enterprise that would undermine the ERISA framework. Nowhere does Sun Life explain the origins in law of its chosen terminology. Nowhere in Sun Life's plan are the standards for when enforcement of an accrual period would be "unreasonable," Brief of Appellant at 8, would not provide a claimant "ample time," Reply Brief of Appellant at 6, or would have the effect of "severely compressing" a claimant's window for filing, Brief of Appellant at 40 (quoting district court opinion). And Sun Life provides no guidance as to how courts should undertake the

extra-statutory and extra-contractual inquiry it proposes, except to say that its own accrual provision was "eminently reasonable as applied to the facts in this case." Brief of Appellant at 39.

The fact-dependent scenarios that Sun Life advocates would run counter to the values of certainty and predictability at the heart of most accrual and limitations rules. Such a rule of federal common law would be particularly incompatible with ERISA, given its written plan requirement and its statutory directive that plans make the rights of their participants clear to non-legal readers. *See, e.g.,* 29 U.S.C. § 1133(1). In short, the insurer's approach would impose upon courts a federal common law methodology less compatible with the ERISA framework than the familiar accrual rule that federal courts have presumptively applied.

The decisions of other courts do not persuade us otherwise. The Ninth Circuit has deemed accrual provisions such as Sun Life's unenforceable, concluding that such provisions create incentives for plans to use their governing documents to undermine their participants' civil claims—in the case before it, for instance, by making claims accrue when proof of loss was due and allowing the statute to expire before a plan participant knew that his claim had been denied. *Price v. Provident Life & Accident Ins. Co.,* 2 F.3d 986, 988 (9th Cir.1993). "ERISA," the Ninth Circuit wrote, "does not permit such a result." *Id.; see also Miller v. Fortis Benefits Ins. Co.,* 475 F.3d 516, 520 (3d Cir.2007) (rejecting district court's holding that accrual date should be taken from plan document because "the accrual date for federal claims is governed by federal law, irrespective of the source of the limitations period").

■ While the Seventh Circuit enforced a contractual accrual date, the focus of its opinion was on plans' freedom to set limitations periods, not accrual dates. *Doe v. Blue Cross & Blue Shield United of Wis.,* 112 F.3d 869, 873–75 (7th Cir.1997).[3] We could not agree more that ERISA generally affords plans the flexibility to set limitations periods, nor do we take issue with those decisions enforcing contractual limitations periods of varying lengths. *See, e.g., Wilkins v. Hartford Life & Accident Ins. Co.,* 299 F.3d 945, 948–49 (8th Cir. 2002) (barring suit based upon three-year contractual limitations period that would have expired even if statute were tolled during plan's consideration of claim); *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan,* 160 F.3d 1301, 1302–04 (11th Cir.1998) (enforcing ninety-day limitations period that did not begin to run until denial of claim). Plans may legitimately wish to avoid extended limitations periods, because the disability status of a particular plaintiff may shift significantly over time, and because both the interests of claimants and a plan's own accounting mechanisms may be served by prompt resolution of claims. Our quarrel is thus not with the ability of plans to set limits on the time in which claimants may seek review but with the lack of fair notice to claimants in Sun Life's chosen framework.

Our dissenting colleague acknowledges that there would be "some uncertainty" with respect to its approach but contends that this "uncertainty would be no differ-

---

**3.** A Fifth Circuit decision that Sun Life also cites does not bear directly upon this case, because while the Fifth Circuit applied a plan's accrual and limitations provision, neither party in the case had challenged the provision and the plaintiff prevailed. *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan,* 426 F.3d 330 (5th Cir.2005).

ent than that which exists regarding periods running from the date that a claim is denied." *Post* at 262. This is incorrect. Any uncertainty about the reasonableness and hence enforceability of contractual limitations periods that run from the date of claim denial is much less than that engendered by contractual accrual dates such as that of Sun Life, whose enforcement would depend in each case upon the amount of time needed to resolve a claim internally and could not be determined at the outset from plan documents.

Under Sun Life's approach, there would be compression of the stated limitations time in every case, some reasonable, and others not. For instance, here, the three-year limitations period shrunk to approximately two once the plan completed its appeals. Every limitations period under Sun Life's approach would be significantly shortened by internal deliberations and appeals, and only some accrual provisions would be enforced. The case-by-case assessment of this compression that Sun Life advocates not only undermines the ERISA provisions noticed above but lays waste to limitations periods' critical purpose of providing potential plaintiffs with meaningful notice of the timeliness of their actions and providing potential defendants an equally clear sense of when the time on possible claims has run.[4]

## D.

The arguments of our fine colleague in dissent do not change our view. Our colleague points in part to the existence of federal regulations that place outer limits on the amount of time that a plan may take in deciding a disability claim. The regulations limit the time that a plan may take in its initial consideration of a disability claim to 45 days from the filing of a claim, with two 30-day extensions allowed when needed, 29 C.F.R. § 2560.503-1(f)(3) (2006), and they limit the time that a plan may take in considering an internal appeal to 45 days from the filing of the appeal, with the possibility of one extension, *id.* §§ 2560.503-1(i)(1)(i), 2560.503-1(i)(3)(i).

These time limits are long enough that depending on the length of the period in the plan, a plan's decision-making can eat up the entire limitations period. Moreover, plans will face incentives to delay in order to squeeze a participant's potential cause of action even when total expiration is not in question. On the theory that ERISA plans' limitations periods can be compared to the limitations periods for suits brought to set aside administrative decisions, which are ordinarily 30 or 60 days after a decision is rendered, *see Blue Cross & Blue Shield United of Wisc.,* 112 F.3d at 875, courts generally allow plans to impose limitations periods of several months in length, which could easily be consumed by a plan adhering to the periods prescribed under the regulations. But to repeat: even when a plan's limitations period cannot be entirely consumed by its

---

4. Sun Life argues that a court should not enforce the three-year limitations period contained in its plan document without enforcing the accrual date to which the limitations period is tied, but even if the entire provision is deemed unenforceable, the limitations period remains three years. In the absence of a valid contractual provision governing limitations, we borrow a limitations period from the law of North Carolina, given the plan's statement that it "is delivered in North Carolina and subject to the laws of that jurisdic-

tion." *See Dameron v. Sinai Hosp. of Baltimore, Inc.,* 815 F.2d 975, 981-82 (4th Cir. 1987) (applying state's statute of limitations for breach of contract). North Carolina law provides a three-year limitations period for breach of contract claims. *See* N.C. Gen.Stat. § 1-52(1) (2005). Sun Life issued a final denial of White's claim for disability benefits on March 28, 2001, and White filed suit less than three years later, on March 26, 2004. As a result, her civil action was timely.

internal decision-making, there remains the incentive to delay claims and cut short the period in which a claimant can bring an action, which will be present whether the plan is capable of eliminating the time available to its claimants or merely diminishing this time.

Moreover, the time limits prescribed in the regulations are themselves somewhat elastic and do not apply to all of the time that would be counted against a claimant. For instance, the regulations require that a disability plan provide at least 180 days to appeal an initial benefits determination, 29 C.F.R. §§ 2560.503–1(h)(4), 2560.503–1(h)(3)(i), but do not set a maximum time for appeals filing, although the pre-appeal period will be counted against a claimant who may require some time to obtain relevant or additional materials and present an appeal. In addition, by requesting more information for its determination, a plan can toll time constraints that the regulations impose on its consideration, even as the limitations period in the plan document would continue to run against the claimant. *Id.* § 2560.503–1(f)(4) (providing that when plan extends claims period to seek additional information needed to resolve claim, regulatory limitations period is tolled "from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information"). While the dissent engages in speculative calculations under the regulations, it seeks to soft-pedal the amount of time it might actually take a plaintiff to present a meaningful internal appeal. The regulations, which under Sun Life's scheme would all apply to post-accrual conduct, thus fail to alleviate the concerns we have expressed regarding incentive effects, constantly shifting time periods, the absence of fair notice to all parties, and the continual tension between internal appeals and judicial review. Perhaps recognizing that the reg-

ulations hardly resolve the problem, the appellant makes no reference to them in its extensive briefing.

The dissent's analysis of Sun Life's provision only deepens our concerns regarding the extent to which a "reasonableness" standard will leave plans and their participants at sea. The dissent applies in one fashion or another the same reasonableness analysis that Sun Life advocates. Our colleague says he would enforce Sun Life's provision to bar White's claims because it was reasonable "as written," *see post* at 262, but underscores the facts of this case, *see post* at 256–57, 260 n. 4 (emphasizing time this particular plaintiff had to file suit). If the dissent is implying that we are to interpret an accrual/limitations scheme such as Sun Life's as facially reasonable, that wholly fails to anticipate the length of other limitations periods and the length of other internal appeals processes. In short, the dissent fails to account for the compression of time that can shorten a stated limitations period to an "unreasonable" length. If the dissent is suggesting that the limitations period is reasonable as applied (Sun Life's position), that gives us little guidance beyond the facts of a particular case.

This confusion over whether courts should employ facial reasonableness tests or applied reasonableness tests required by proof of claim accrual provisions is not the only uncertainty created by the dissent. Beyond this, our colleague states that while White had less time available as a result of Sun Life's accrual provision than she would have had in the absence of the provision, the time left by the limitations period would still be "generous," *post* at 256, "ample," *post* at 261, and above all, "eminently reasonable," *post* at 259—using the term "reasonable" or some variation on it more than twenty times throughout the opinion. These adjectives, however, pro-

vide no standards for determining the enforceability of proof of claim accrual provisions, beyond making plain the dissent's view that this particular accrual provision is a reasonable one, at least in this particular case. Indeed, the dissent, like Sun Life, cannot foreclose the possibility that the reasonableness of proof of claim accrual/limitations schemes will change over time: Any position that a limitations provision may still apply notwithstanding the shortened period left by accrual provisions such as Sun Life's to file suit is but another way of saying that a single limitations period may sometimes be reasonable, and at other times not.

The dissent indicates that it is not troubled by the absence of standards or guidance in its approach. Future claimants and plans would thus be left to guess at what future courts will do when arguably reasonable limitations periods have arguably been unreasonably shortened by accrual provisions that consume time left claimants to file a civil suit. In this, the dissent misapprehends the function of rules. It is the purpose of a rule to anticipate the future and to provide the universe of possible parties with a clear standard to which they can conform their conduct.

In rejecting operation of the familiar federal accrual standard, the dissent does a disservice to all parties to an ERISA dispute. The irony is that the dissent would abandon a rules-based approach for case-by-case uncertainty in the context of accrual rules and limitations periods, where certainty is particularly desirable. *See Rotella v. Wood,* 528 U.S. 549, 555, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (rejecting proposed accrual rule deemed "at odds with the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"). The irony is

only multiplied when an undefined reasonableness standard is adopted in the context of a statute that places a premium on clear notice and comprehensible plan provisions. Our good colleague says plans must be interpreted "as written," *post* at 262, but the opposite result obtains under his standard where the interplay of accrual and limitations provisions and the tensions between internal and judicial review would only magnify the uncertainty that ERISA's framework of written instruments with clear rules and plain notice was designed to prevent.

## III.

■ Inasmuch as White's disability claim was not time-barred, we must proceed to the merits. The district court found that Sun Life's denial of benefits should be reviewed under an abuse of discretion standard because Sun Life's written plan gave the insurer discretionary authority to make disability determinations. *See Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 341–42 (4th Cir.2000) (holding that abuse of discretion review should apply to fiduciary's discretionary decision under ERISA). This standard requires that a decision be rationally supportable, which in turn requires that it be "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 788 (4th Cir.1995) (internal citation omitted). When, as here, a plan "both administers the plan and pays for benefits received by its members," so that a denial of benefits improves the insurer's bottom line, courts consider this as a factor in their review. *Id.* The district court granted summary judgment to White under this standard because it found disability benefits could not have reasonably been denied based upon the evidence.

■ White's disability claim came after she consulted with multiple specialists over the course of more than two years regarding severe and chronic pain in her lower back, buttocks, and legs. Surgery revealed that White's pain was no phantom syndrome: her "quite deformed" piriformis muscle was, as her surgeon put it, "tethering the peroneal nerve division, which it had split, and was running in between." Dr. Kline, the surgeon whom both parties describe as a nationally recognized expert, warned that surgery would not necessarily end the patient's chronic pain. White chose to go forward, but she reported that while the severity of her pain ebbed and flowed following the operation, it never subsided.

The physicians who treated White before and after her surgery prescribed painkillers and muscle relaxants for symptoms they regarded as quite serious. Dr. Jones and Dr. Cain explained that White's extreme pain and the inability to sit at work were consequences of piriformis syndrome, unresolved after surgery. Dr. Jones wrote that he believed long-term disability was "probably the only option left to her," and explained his conclusion in a letter submitted to Sun Life. "Based on my experience and my treatment of Ms. White over the past two years, I do believe that she is disabled from performing any work on a continued and sustained basis due to her ongoing symptoms of chronic pain that have arisen from her peripheral nerve disorder," he wrote, adding that in his professional opinion, White had been "disabled from any occupation since at least February, 2000."

■ To be sure, ERISA does not impose a treating physician rule, under which a plan must credit the conclusions of those who examined or treated a patient over the conclusions of those who did not. *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 126 (4th Cir.1994). But ERISA does require that in order to deny benefits, an insurer must present a basis "a reasoning mind would accept as sufficient" to support its decision. *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.1984) (internal citation omitted). Sun Life has not done so. It first suggests that it justifiably denied benefits because the opinions of White's treating physicians conflicted. "[I]t is not an abuse of discretion for a plan fiduciary to deny ... benefits where conflicting medical reports were presented," *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir.1999), but Drs. Cain, Jones, and Kline did not submit conflicting reports. To the contrary, the reports indicate that the physicians collaborated by referring the patient to different doctors for the different aspects of her care, sharing their findings, and referencing each other's treatments and conclusions in a manner indicating a single treatment plan.

For instance, Dr. Jones referred White to Dr. Cain for management of her narcotic medications, and Dr. Cain routinely sent Dr. Jones the treatment reports from the resulting visits, noting in one report that she was also sending Dr. Jones a copy of the contract that White had signed. Dr. Jones then incorporated Dr. Cain's medication regimen in his own treatment reports. Similarly, Dr. Kline corresponded with Dr. Jones regarding White's treatment, and deferred to the medication regimen that Dr. Jones and Dr. Cain had established, writing on March 20, 2000, "I think pain management we will leave in your hands."

Sun Life disregards this mutual reliance and instead seeks to make much of several sentences taken out of context from Dr. Kline's March letter as establishing a disagreement among the physicians. Sun Life notes that Dr. Kline wrote that the

"sciatic function" on his patient's right and left side was excellent. Nothing in Dr. Kline's letter, however, suggests that he believed this meant that White's pain was illusory. To the contrary, the sentence upon which Sun Life relies is the last in a long paragraph indicating that the patient suffered from serious ills, namely lower-back, buttock, and leg pain and decreased range of motion. Dr. Kline's follow-up recommendations further indicate that he credited White's reports, in that the surgeon suggested exercises to ease her pain and did not recommend reducing White's intake of medications. Simply put, the remark on which Sun Life relies does not contradict Dr. Jones' description of total disability, or for that matter the rest of Dr. Kline's own report. Cf. *Myers v. Hercules, Inc.*, 253 F.3d 761, 766–67 (4th Cir. 2001) (rejecting denial of disability benefits based upon sentences in physician reports taken out of context, when reports as a whole supported finding of disability).

We also fail to find a basis for denying benefits in the other sentence in Dr. Kline's report upon which Sun Life relies. While Dr. Kline wrote that White stopped her work at Greer Laboratories "more because of familial problems and work problems than her disability and difficulty with her back and leg," this one sentence does not cast doubt upon her disability. Nothing in Dr. Kline's report suggests that the family conflicts and workplace difficulties were in any way independent of White's disability, and other reports explain all these problems as intertwined. Nor is the reason for White's departure relevant, so long as White was unable to perform her occupation—a fact supported by the abundant medical evidence, and upon which Dr. Kline did not express doubt. As the district court wrote, "Whether an employee is physically present at work, and whether she is able to perform the material duties of her occupation while there, are two

separate issues. Dr. Kline's statement relates to the former, but disability under the Plan is premised on the latter."

In the absence of a conflict among White's physicians, Sun Life turns to two brief letters by Dr. Sarni, a physician-consultant. Dr. Sarni never examined the patient nor did he at any time contact any of White's own doctors, two of whom were neurosurgeons whose speciality thus included White's syndrome, and all of whom had treated White for an extended period. While Dr. Sarni's two one-page letters expressed skepticism about White's disability, his conclusions lack support in White's medical records. Dr. Sarni summarized the patient's medication regimen and wrote that her "pain complaints are far out of proportion to the pathology described," adding, "There is no objective data at this point to support such significant impairments." This statement, however, is flatly incorrect. MRI and other tests were unable to pinpoint White's problem prior to surgery, but surgery revealed a severe physical deformity consistent with White's complaints of pain in the lower back, buttocks, and legs. White's surgeon warned that an operation would not necessarily solve White's problems and suggested that it might aggravate them. This finding of "severe abnormality" during major surgery provides objective evidence of White's impairments.

Furthermore, Dr. Sarni's suggestion that White's medications were excessive—based exclusively upon a review of White's medical records—lacks a basis in the records themselves. There is no doubt that White took painkillers. The file is replete, however, with physician statements that the doctors who examined and treated White believed these drugs were needed to ease her pain. *See, e.g.*, December 19, 2000 letter from Dr. Jones (stating that after surgery White "continued to require

extremely large doses of narcotics for pain control" and describing White as "disabled from performing any work on a continued and sustained basis due to her ongoing symptoms of chronic pain that have arisen from her peripheral nerve disorder"); November 22, 2000 report of Dr. Cain (stating patient's prescriptions "have been continually re-evaluated" and that the "patient appears to need this dosage in order to function"); April 17, 2000 report of Dr. Cain (stating "[c]hronic pain secondary to piriformis syndrome ... appears to be slightly improved" after dosage adjustment and stating patient should "[c]ontinue current medications with no increase at this time"). In fact, Sun Life refers us to no statement from any of those treating White that the pain medication was unnecessary or that the pain itself was imagined.

The other evidence upon which Sun Life relies is equally unavailing. A vocational consultant who also did not examine White wrote that "[i]t is not clear to me what specifically precludes her from doing her sedentary job," but offered no reason why the constant pain and inability to sit described by White's various examining physicians did not fully support Dr. Jones' conclusion that his patient was unable to work. Moreover, contrary to Sun Life's suggestion, the fact that White suffered from depression does not indicate that her reports of chronic pain were an expression of psychiatric problems that White refused to treat. White's treating physicians repeatedly described the claimant's depression as a product of serious pain and inability to work or perform other activities, rather than the cause of those problems.

In sum, none of the material to which Sun Life points undercuts the account of prolonged disability presented consistently by White's medical records and her physicians' statements. White's pain was such that she elected to undergo major surgery whose outcome was uncertain in hope of finding some relief. The surgery revealed a significant deformity. In the operation's aftermath, White continued to make multiple visits to multiple physicians for leg, lower-back, and buttock pain, which White complained prevented her from performing her job responsibilities and caused depression and family problems. The copious medical records from these visits provide no basis to conclude that White's pain was illusory or that she began suddenly to malinger in a company where she had risen through the ranks for well over a decade. Because Sun Life appears to have "reached its decision only by misreading some evidence and by taking other bits of evidence out of context," *Myers*, 253 F.3d at 768, we cannot find its denial of benefits was supportable.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

WILKINS, Chief Judge, dissenting:

The plan states that "[n]o legal action may start ... more than 3 years after the time Proof of Claim is required," which equated here to August 9, 2003. J.A. 636. Despite an uneventful administrative claim process, White failed to meet this deadline. Sun Life first denied White's claim on August 15, 2000 and then denied her appeal of that decision by letter dated March 28, 2001. At that point, White, who was represented by counsel, had no further administrative remedies to exhaust and was left with more than 28 months to decide whether to file a civil action. Yet, she did not bring the present action until March 26, 2004—more than seven months too late.

Having failed to bring suit within the generous period that the plan allowed,

White now attempts to avoid the clear application of the plan language. The majority allows White to do just that, refusing to enforce the plan terms and holding that the plan drafters were not authorized to require that civil actions be filed within three years of the date that a claimant's Proof of Claim was due. Because I believe the majority's refusal to enforce the plan as written is plainly unjustified, I respectfully dissent.

## I.

## A.

ERISA requires that any employee benefit plan be "established and maintained pursuant to a written instrument." 29 U.S.C.A. § 1102(a)(1) (West 1999). It also mandates that plan terms be enforced, expressly providing causes of action to compel enforcement of plan terms and to remedy failures to enforce plan terms. *See* 29 U.S.C.A. § 1104(a)(1)(D) (West 1999) (requiring plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan"); 29 U.S.C.A. § 1132(a)(1)(B) (West 1999) (allowing participants to pursue a civil action "to enforce [their] rights under the terms of the plan"); 29 U.S.C.A. § 1132(a)(3) (West 1999) (providing cause of action "to enjoin any act or practice which violates ... the terms of the plan" or to obtain other equitable relief "to enforce ... the terms of the plan"). Indeed, "one of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans." *United McGill Corp. v. Stinnett*, 154 F.3d 168, 172 (4th Cir.1998). For this reason, "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Id.* (internal quotation marks omitted).

Congress intended for courts to develop federal common law regarding ERISA to supplement its statutory provisions. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). However, this authority is limited to circumstances in which it is "necessary to fill in interstitially or otherwise effectuate the ERISA statutory pattern enacted in the large by Congress." *United McGill Corp.*, 154 F.3d at 171 (internal quotation marks & alteration omitted). Thus, "resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA ... or threaten to override the explicit terms of an established ERISA benefit plan." *Id.* (internal quotation marks & alteration omitted). The majority's resort to federal common law here is clearly inappropriate for both reasons.

White's suit seeks benefits under an employee benefit plan pursuant to ERISA, *see* 29 U.S.C.A. § 1132(a)(1)(B). ERISA does not contain an express limitations period applicable to causes of action under this section. Thus, for default rules, courts have looked to state law regarding the length of limitations periods, *see Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), while holding that federal law governs the date when the limitations period commences, *see Rawlings v. Ray*, 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941). Notwithstanding the existence of these default rules,

> it is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.

*Order of United Commercial Travelers v. Wolfe*, 331 U.S. 586, 608, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947).

The *Wolfe* rule clearly applies to an ERISA plan, which, after all, "is nothing more than a contract, in which parties as a general rule are free to include whatever limitations they desire." *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan*, 160 F.3d 1301, 1303 (11th Cir.1998). Although such contracts are not negotiated individually with employees, employee benefits comprise part of an employee's compensation package, and companies that erect unreasonable barriers to their employees' receipt of benefits can hurt themselves in competing for employees.[1] *See Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 874 (7th Cir.1997).

The plan here states in no uncertain terms that "[n]o legal action may start ... more than 3 years after the time Proof of Claim is required." J.A. 636. The plan provides that Proof of Claim was required "no later than 90 days after the end of the Elimination Period." *Id.* at 638. The "Elimination Period" is defined as "a peri-od of continuous days of Total or Partial Disability for which no LTD Benefit is payable." *Id.* at 612. Under the plan terms, the "Elimination Period" was 90 days and "beg[an] on the first day of Total or Partial Disability." *Id.* at 605, 612. White alleged in her complaint that her first day of "Total Disability" was February 11, 2000. Thus, her Elimination Period expired on May 11, 2000, and her Proof of Claim was due on August 9, 2000.[2] The terms of the plan therefore required that any suit based on the facts before us be filed on or before August 9, 2003. On that basis, the limitations period contained in the plan must be enforced unless controlling law prohibits modification of the default rule or the period provided in the plan is unreasonable. Neither of these circumstances pertains here.

First, no controlling law prohibits adoption of the limitations period specified in the plan. As the majority observes, under the general federal rule, a cause of action under § 1132(a)(1)(B) accrues when a plan administrator formally denies a claim, *see Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 72 (4th Cir.1989).[3] *See ante*, at

1. Additionally, Congress' decision not to include a limitations period in the applicable statute specifically demonstrates a willingness to accept reasonable agreed-upon limitations periods. *See Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1205 (7th Cir.1992).

2. White argues that Proof of Claim was actually due one year and 90 days from the end of the Elimination Period. That is incorrect. The plan states that for long term disability,

 proof of claim must be given to Sun Life no later than 90 days after the end of the Elimination Period.

 If it is not possible to give proof within these time limits, it must be given as soon as reasonably possible. Proof of claim may not be given later than one year after the time proof is otherwise required unless the individual is legally incompetent.

*Id.* at 638. Here, it clearly was possible for White to give Proof of Claim within the 90 days after the end of the Elimination Period, as she in fact did so.

 White also argues that her suit was timely filed because North Carolina General Statutes § 58–51–15(a)(7) (2005) provides that a proof of loss is not due until "180 days after the termination of the period for which the insurer is liable." That statutory provision is plainly inapplicable here as it concerns claims for which the insurer has determined there is a qualifying disability that would entitle the claimant to "periodic payment[s] contingent upon continuing loss." N.C. Gen.Stat. § 58–51–15(a)(7).

3. While *Rodriguez* dictates when the cause of action arises, the Supreme Court has recognized that the event that gives a party the right to bring suit need not be the same as the event that commences the running of a limitations period. *See Reiter v. Cooper*, 507 U.S.

246. But, a federal rule concerning when a limitations period begins *in the absence of an agreement to adopt a shorter period* certainly is not a rule prohibiting adoption of a shorter period. *See Wetzel v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222 F.3d 643, 650 (9th Cir.2000) (en banc) (holding that even though federal law provided accrual date for § 1132(a)(1)(B) cause of action, whether separate limitations period provided in the plan barred plaintiff's action presented a separate question); *cf. Harbor Ct. Assocs. v. Leo A. Daly Co.*, 179 F.3d 147, 150–51 (4th Cir.1999) (affirming enforcement of provision contracting around Maryland's default rule setting the date on which the limitations period would commence "[i]n light of [Maryland's] established judicial commitment to protecting individuals' efforts to structure their own affairs through contract"). Indeed, the *Wolfe* rule presumes that a default limitations period exists and provides that the parties can agree to a shorter period as long as it is reasonable.

Second, this limitations period was eminently reasonable. Nowhere in the record is there any suggestion that the limitations period was "a subterfuge to prevent lawsuits." *Northlake Reg'l Med. Ctr.*, 160 F.3d at 1304. Indeed, the limitations period was the very one that North Carolina and the vast majority of other states require be included in insurance policies like the one at issue here, *see* N.C. Gen.Stat. § 58–51–15(a)(11) (2005); *Wetzel*, 222 F.3d at 647 n. 5 (listing states). It is one that at least two circuits have held to be reasonable. *See Doe*, 112 F.3d at 874–75 (holding on facts essentially identical to those of the present case that plan limitations period was reasonable); *Blaske v. UNUM Life Ins. Co. of Am.*, 131 F.3d 763, 764 (8th Cir.1997) (holding that limitations period

258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604

identical to that at issue here was reasonable). Tying the limitations period to the date on which proof of claim is due serves the important function of ensuring that a civil action is not too remote in time from the events giving rise to the plaintiff's claim. *See Mo., Kan. & Tex. Ry. Co. v. Harriman Bros.*, 227 U.S. 657, 672, 33 S.Ct. 397, 57 L.Ed. 690 (1913) (explaining that the purpose of a limitations period is to avoid a loss of evidence as the result of the passage of time); *ante*, at 250 ("Plans may legitimately wish to avoid extended limitations periods, because the disability status of a particular plaintiff may shift significantly over time, and because both the interests of claimants and a plan's own accounting mechanisms may be served by prompt resolution of claims.").

Although the period here could commence before a claim was formally denied, the three-year period was easily sufficient to preserve the claimant's rights considering the nature of a § 1132(a)(1)(B) suit:

> A suit under ERISA, following as it does upon the completion of an ERISA-required internal appeals process, is the equivalent of a suit to set aside an administrative decision, and ordinarily no more than 30 or 60 days is allowed within which to file such a suit. Like a suit to challenge an administrative decision, a suit under ERISA is a review proceeding, not an evidentiary proceeding. It is like an appeal, which in the federal courts must be filed within 10, 30, or 60 days of the judgment appealed from, depending on the nature of the litigation, rather than like an original lawsuit.

*Doe*, 112 F.3d at 875 (citations omitted); *see also Northlake Reg'l Med. Ctr.*, 160 F.3d at 1304 (enforcing limitations period of 90 days from denial of claim). The

(1993).

Department of Labor regulations applicable to the plan here require that a plan administrator notify a claimant of a denial of benefits within a reasonable period not to exceed 45 days after receipt of the claim. *See* 29 C.F.R. § 2560.503–1(f)(3) (2006). In certain circumstances, this period may be extended up to 60 additional days. *See id.* And, if the plan administrator determines that additional information is needed to resolve the claim, the time the claimant takes to produce the information is not counted toward the administrator's time limitations. *See* 29 C.F.R. § 2560–503–1(f)(4) (2006). If a claimant seeks internal review of the plan administrator's decision, the plan must notify a claimant of its determination within a reasonable time period not to exceed 45 days, with the possibility of an extension of up to 45 additional days. *See* 29 C.F.R. § 2560.503–1(i)(3) (2006). If the plan fails to make a decision within these deadlines, administrative remedies will be considered to be exhausted, and a claimant is entitled to file suit. *See* 29 C.F.R. § 2560.503–1(*l* ) (2006). These time limitations ensure that even if a plan had obtained all possible extensions, it could take only 195 days of the three-year (1,095–day) limitations period. Thus, even under this extreme scenario, if a claimant spent six months responding to requests for additional information and another six months preparing an administrative appeal, she would still have almost a year and a half to decide whether to initiate a civil action. This is far more than the 30 or 60 days that would be sufficient for such a decision. *See Doe*, 112 F.3d at 875. Accordingly, the three-year time period is not only more than sufficient to eliminate any significant possibility that a

claimant could be disadvantaged; it likely leaves claimants with *much* more than 30 or 60 days after the claim is denied in which to bring suit.[4] Thus, the period was clearly reasonable.

### B.

The majority concludes that although parties may agree to modify the length of a limitations period, they may not reject the federal default rule that the period begins when the claim is denied. *See ante*, at 247 (holding that the plan drafters may not provide that the limitations period can commence before administrative remedies have been exhausted because they "cannot write over the constraints established by federal law"). This is plainly incorrect. *Wolfe* allows parties to a contract to limit "the time for bringing an action" so long as the agreed upon period is reasonable. *Wolfe*, 331 U.S. at 608, 67 S.Ct. 1355. Shortening the length of the default limitations period is only one way to limit the time for bringing an action. Setting a date earlier than the default date for commencement of the period is another. *See, e.g., Harbor Ct. Assocs.*, 179 F.3d at 150–51. Moreover, as noted above, tying the limitations period to the date that Proof of Claim was due—as opposed to beginning the period only when a claim is denied—has the perfectly rational purpose of ensuring that no suit is too remote in time from the events giving rise to the claim. *See Harriman Bros.*, 227 U.S. at 672, 33 S.Ct. 397. The *Wolfe* rule and the freedom-of-contract principles underlying it clearly allow such a shortening of the limitations period to achieve this goal.

The majority also concludes that federal common law prohibits the adoption of the

---

4. In fact, that was the case with White. Sun Life first denied White's claim on August 15, 2000. It then denied her appeal of that decision by letter dated March 28, 2001, leaving White with no further administrative remedies to exhaust. White, who was represented by counsel, then had more than *28 months* within which to file an action in district court.

limitation period included in the plan because it would undercut the right to bring a § 1132(a)(1)(B) action. *See ante,* at 247 (holding that the "interlocking remedial structure [between administrative and judicial review] does not permit an ERISA plan to start the clock ticking on civil claims while the plan is still considering internal appeals"). The majority notes that with the limitations period in the plan, the clock can begin running before a claimant is entitled to file suit, thereby either reducing the time she has to bring suit or eliminating it altogether. *See id.* at 247–48. The majority also submits that such periods give plan administrators a motive to delay denying claims so as to reduce the time that plaintiffs have to bring suit. *See id.*

I believe the majority's concerns and its invocation of federal common law are without basis and certainly do not justify a refusal to enforce the plan terms. As I have explained, the three-year period is well-designed to leave a claimant with ample time to decide whether to file a civil action. Further, the fact that the regulations allow a plan administrator to spend no more than *195 days* deciding a claim and administrative appeal eliminates any significant possibility that a devious plan administrator could believe he could run out the three-year clock on a claimant before the claimant could sue. The presence of the clearly stated period serves to notify the parties from the very beginning of the process of the date by which a civil suit must be initiated. There is simply no reason to believe that diligent claimants under this plan would have any trouble protecting their rights, and the majority does not contend otherwise.

Regardless of whether we might identify policy reasons why the default period would be preferable, it is for the plan drafter, not this court, to determine the plan terms. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("[E]mployers have large leeway to design ... plans as they see fit."); *Gayle v. UPS,* 401 F.3d 222, 228 (4th Cir.2005) (noting "the well-established principle that plans can craft their governing principles as they think best"); *cf. Kress v. Food Employers Labor Relations Ass'n,* 391 F.3d 563, 570 (4th Cir.2004) (rejecting argument that plan term requiring attorneys' fees to be subrogated to plan reimbursement should not be enforced because it would discourage litigation). Despite the majority's statement that it "reaffirm[s]" that principle, *ante,* at 246, I believe its decision clearly undermines it.

The majority concludes that its resort to federal common law to defeat the plain language of the plan is justified because enforcement of the limitations period would "immerse[ ] federal courts in a federal common law enterprise that would undermine the ERISA framework." *Id.* at 249. The "enterprise" that the majority refers to is determining whether the amount of time a claimant actually has after a denial to file a civil action is "reasonable," so that the plan period may be enforced under *Wolfe. See id.* The majority similarly concludes that refusing to enforce the limitations period plainly provided for in the plan is necessary to eliminate the uncertainty that could exist regarding whether the time a claimant has left to file after a claim is denied is reasonable. *See id.* at 249–51. But, with all due respect to the majority, it is only the majority's departure from the plain language of the plan that immerses the court in federal common law and creates uncertainty regarding plan terms.

The majority recognizes that despite the uncertainty regarding what limitations period length will be held to be reasonable

under *Wolfe*, "ERISA generally affords plans the flexibility to set limitations periods." *Id.* at 262. The majority concludes, though, that the uncertainty rises to an unacceptable level when limitations periods run from the date of the claim because determination of whether the period is reasonable depends "in each case upon the amount of time needed to resolve a claim internally" and thus "could not be determined at the outset from plan documents." *Id.* at 262; *see id.* at 248–51. However, the majority never explains why it believes that the reasonableness or unreasonableness of a plan term could be altered by such subsequent events, and I certainly do not believe that it could. We should judge the reasonableness of a limitations period that runs from the date proof of claim is due as we judge any other limitations period, by determining the reasonableness of the term as written. While there would be, of course, some uncertainty regarding what we would hold to be the shortest reasonable period, that uncertainty would be no different than that which exists regarding periods running from the date that a claim is denied. In contrast, the vague "tension" that the majority relies on here to defeat the plain terms of the plan surely will give rise to much future litigation concerning what other plan terms are in "tension" with ERISA policies such that they may not be enforced, necessitating the development of much more extensive federal common law on the subject. *Id.* at 248.

Similarly, it is only the majority's refusal to enforce the clear plan terms that fails to promote proper notice to the parties. *See United McGill Corp.*, 154 F.3d at 172 (explaining that "the plain language of an ERISA plan must be enforced" and that "one of the primary functions of ERISA is to ensure the integrity of written, bargained-for benefit plans"). From the time that White filed her administrative claim

here, the date by which she was required to file a civil action was set at August 9, 2003. With all the majority's discussion of "providing potential plaintiffs with meaningful notice of the timeliness of their actions and providing potential defendants an equally clear sense of when the time on possible claims has run," *ante*, at 251, it is the majority that pulls the rug out from under the parties at this late stage of the litigation by refusing to enforce the plan as written. By refusing to enforce the limitations period clearly provided in the plan when that period is well designed to serve the interests underlying statutes of limitations, the majority will also leave future claimants and plan administrators under a variety of plans wondering which plan provisions this court will refuse to apply next.

## C.

It bears noting that the Seventh Circuit, in a thorough and well-reasoned opinion by then-Chief Judge Posner, enforced the very limitations period at issue here. *See Doe*, 112 F.3d at 872–73, 875. The majority brushes *Doe* aside, stating that while it "enforced a contractual accrual date, the focus ... was on plans' freedom to set limitations periods, not accrual dates." *Ante*, at 250. This characterization is simply incorrect. In applying the *Wolfe* reasonableness rule, *Doe* considered the appropriateness of the "limitations *period*," *Doe*, 112 F.3d at 873 (emphasis in original), which it correctly understood to include the event that commences the period as well as the length of the period. In this regard, *Doe* clearly considered the fact that the limitations period commenced when proof of claim is due and that the resulting period could theoretically be compressed or eliminated if the plan's resolution of the claim took a very long time. *See id.* Even considering that the length of the period would vary depending upon

the time the plan takes to deny the claim, *Doe* found the period to be "reasonable in general and in th[at] case" in light of the fact that "a suit under ERISA is a review proceeding, not an evidentiary proceeding," and thus, "is like an appeal, which in the federal courts must be filed within 10, 30, or 60 days of the judgment appealed from." *Id.* at 875; *accord Blaske,* 131 F.3d at 764 (holding an identical limitations period to be reasonable).

On the other hand, the two contrary decisions cited by the majority are wholly unpersuasive. *See ante,* at 250. In refusing to enforce plan terms regarding when the applicable limitations period begins, both decisions simply rely on the federal default rule that ERISA claims accrue when a claim for benefits has been denied, without so much as discussing whether the *Wolfe* rule would allow the plan to adopt a reasonable shorter period. *See Miller v. Fortis Benefits Ins. Co.,* 475 F.3d 516, 520–21 (3d Cir.2007); *Price v. Provident Life & Accident Ins. Co.,* 2 F.3d 986, 988 (9th Cir.1993). It is therefore not surprising that the majority makes only cursory mention of these decisions. *See ante,* at 250.

## II.

In sum, the ERISA plan before us plainly requires that any civil action be brought within three years of the date White's Proof of Claim was due. Because no law prevents the plan from adopting a limitations period shorter than the default period, Supreme Court precedent requires that the plan period be enforced so long as it is reasonable. The period here was eminently reasonable—generous even— and well constructed to prevent a suit too temporally removed from the events underlying it. That the majority refuses to enforce it is troubling and will no doubt leave plan administrators and participants in this circuit guessing which plan term this court will next refuse to enforce on the basis that it "creates tension" with ERISA policies. *Id.* at 248.

I would reverse the judgment to White and remand for entry of judgment in favor of Sun Life. I respectfully dissent from the majority's contrary decision.