CURTISS-WRIGHT CORP. *v.* SCHOONEJONGEN ET AL.

No. 93–1935.   Argued January 17, 1995—Decided March 6, 1995

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Laurence Reich* argued the cause for petitioner. With him on the briefs were *Stephen F. Payerle* and *Aaron J. Carr.*

*Richard P. Bress* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Deputy Solicitor General Kneedler, Allen H. Feldman,* and *Ellen L. Beard.*

*Thomas M. Kennedy* argued the cause for respondents. With him on the brief were *Everett E. Lewis, Nicholas F. Lewis, Daniel Clifton, Ira Cure,* and *Shirley Fingerhood.**

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Hollis T. Hurd, Stephen A. Bokat, Robin S. Conrad,* and *Mona C. Zeiberg;* for the ERISA Industry Committee et al. by *Steven J. Sacher* and *Susan A. Cahoon;* for the Manufacturers Alliance for Productivity and Innovation, Inc., by *Peter Buscemi* and *Neal*

JUSTICE O'CONNOR delivered the opinion of the Court.

Section 402(b)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 875, 29 U. S. C. § 1102(b)(3), requires that every employee benefit plan provide "a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." This case presents the question whether the standard provision in many employer-provided benefit plans stating that "The Company reserves the right at any time to amend the plan" sets forth an amendment procedure that satisfies § 402(b)(3). We hold that it does.

I

For many years, petitioner Curtiss-Wright voluntarily maintained a postretirement health plan for employees who had worked at certain Curtiss-Wright facilities; respondents are retirees who had worked at one such facility in Wood-Ridge, New Jersey. The specific terms of the plan, the District Court determined, could be principally found in two plan documents: the plan constitution and the Summary Plan Description (SPD), both of which primarily covered active employee health benefits.

In early 1983, presumably due to the rising cost of health care, a revised SPD was issued with the following new provision: "TERMINATION OF HEALTH CARE BENE-FITS .... Coverage under this Plan will cease for retirees and their dependents upon the termination of business operations of the facility from which they retired." App. 49. The two main authors of the new SPD provision, Curtiss-Wright's director of benefits and its labor counsel,

D. Mollen; and for the National Union Fire Insurance Co. of Pittsburgh, Pa., by Robert N. Eccles.

Briefs of amici curiae urging affirmance were filed for the American Association of Retired Persons by Steven S. Zaleznick and Mary Ellen Signorille; and for the National Association of Securities and Commercial Law Attorneys by Jonathan W. Cuneo, Kevin P. Roddy, Steve W. Berman, Bryan L. Clobes, and Henry H. Rossbacher.

testified that they did not think the provision effected a "change" in the plan, but rather merely clarified it. *Id.,* at 70–71, 79. Probably for this reason, the record is less than clear as to which Curtiss-Wright officers or committees had authority to make plan amendments on behalf of the company and whether such officers or committees approved or ratified the new SPD provision. In any event, later that year, Curtiss-Wright announced that the Wood-Ridge facility would close. Shortly thereafter, an executive vice president wrote respondents a series of letters informing them that their post-retirement health benefits were being terminated.

Respondents brought suit in federal court over the termination of their benefits, and many years of litigation ensued. The District Court ultimately rejected most of respondents' claims, including their contention that Curtiss-Wright had bound itself contractually to provide health benefits to them for life. The District Court agreed, however, that the new SPD provision effected a significant change in the plan's terms and thus constituted an "amendment" to the plan; that the plan documents nowhere contained a valid amendment procedure, as required by § 402(b)(3); and that the proper remedy for the § 402(b)(3) violation was to declare the new SPD provision void *ab initio.* The court eventually ordered Curtiss-Wright to pay respondents $2,681,086 in back benefits.

On appeal, Curtiss-Wright primarily argued that the plan documents did contain an amendment procedure, namely, the standard reservation clause contained in the plan constitution and in a few secondary plan documents. The clause states: "The Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan." App. 37; see also 2 RIA Pension Coordinator ¶ 13,181, p. 13,276R–124 (1994) (reproducing IRS' prototype employee benefits plan, which contains similar language). In Curtiss-Wright's view, this

clause sets forth an amendment procedure as required by the statute. It says, in effect, that the plan is to be amended *by* "[t]he Company."

The Court of Appeals for the Third Circuit rejected this argument, as well as all other arguments before it, and affirmed the District Court's remedy. See 18 F. 3d 1034 (1994). It explained: "A primary purpose of § 402(b)(3) is to ensure that all interested parties [including beneficiaries] will know how a plan may be altered and who may make such alterations. Only if they know this information will they be able to determine with certainty at any given time exactly what the plan provides." *Id.*, at 1038. And the court suggested that § 402(b)(3) cannot serve that purpose unless it is read to require that every amendment procedure specify precisely "what individuals or bodies within the Company c[an] promulgate an effective amendment." *Id.*, at 1039. In the court's view, then, a reservation clause that says that the plan may be amended "by the Company," without more, is too vague. In so holding, the court distinguished a case, *Huber* v. *Casablanca Industries, Inc.*, 916 F. 2d 85 (1990), in which it had upheld a reservation clause that said, in effect, that the plan may be amended "by the Trustees." "By the trustees," the court reasoned, had a very particular meaning in *Huber;* it meant "by resolutio[n] at a regularly constituted board [of trustees] meeting in accordance with the established process of the trustees." 18 F. 3d, at 1039 (citation omitted).

In a footnote, the court related the concurring views of Judge Roth. *Id.*, at 1039, n. 3. According to the court, Judge Roth thought that the notion of an amendment "by the Company" should be read in light of traditional corporate law principles, which is to say amendment "by the board of directors or whomever of the company has the authority to take such action." *Ibid.* And read in this more specific way, "by the Company" indicates a valid amendment procedure that satisfies § 402(b)(3). She con-

curred rather than dissented, however, because, in the court's words, "neither [Curtiss-Wright's] board nor any other person or entity within [Curtiss-Wright] with the power to act on behalf of 'the Company' ratified [the new SPD provision]." *Ibid.*

Curtiss-Wright petitioned for certiorari on the questions whether a plan provision stating that "[t]he Company" reserves the right to amend the plan states a valid amendment procedure under § 402(b)(3) and, if not, whether the proper remedy is to declare this or any other amendment void *ab initio.* We granted certiorari on both. 512 U. S. 1288 (1994).

## II

In interpreting § 402(b)(3), we are mindful that ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. See *Adams* v. *Avondale Industries, Inc.,* 905 F. 2d 943, 947 (CA6 1990) ("[A] company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan"). Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans. See *Shaw* v. *Delta Air Lines, Inc.,* 463 U. S. 85, 90–91 (1983). Accordingly, that Curtiss-Wright amended its plan to deprive respondents of health benefits is not a cognizable complaint under ERISA; the only cognizable claim is that the company did not do so in a permissible manner.

## A

The text of § 402(b)(3) actually requires *two* things: a "procedure for amending [the] plan" *and* "[a procedure] for identifying the persons who have authority to amend the plan." With respect to the second requirement, the general "Definitions" section of ERISA makes quite clear that the term

"person," wherever it appears in the statute, includes companies. See 29 U. S. C. § 1002(9) ("The term 'person' means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization"). The Curtiss-Wright reservation clause thus appears to satisfy the statute's identification requirement by naming "[t]he Company" as "the perso[n]" with amendment authority.

The text of § 402(b)(3) speaks, somewhat awkwardly, of requiring a *procedure* for identifying the persons with amendment authority, rather than requiring identification of those persons outright. Be that as it may, a plan that simply identifies the persons outright necessarily indicates a procedure for identifying the persons as well. With respect to the Curtiss-Wright plan, for example, to identify "[t]he Company" as the person with amendment authority is to say, in effect, that the procedure for identifying the person with amendment authority is to look always to "[t]he Company." Such an identification procedure is more substantial than might first appear. To say that one must look always to "[t]he Company" is to say that one must look *only* to "[t]he Company" and *not* to any other person—that is, not to any union, not to any third-party trustee, and not to any of the other kinds of outside parties that, in many other plans, exercise amendment authority.

The more difficult question in this case is whether the Curtiss-Wright reservation clause contains a "procedure for amending [the] plan." To recall, the reservation clause says in effect that the plan may be amended "by the Company." Curtiss-Wright is correct, we think, that this states an amendment procedure and one that, like the identification procedure, is more substantial than might first appear. It says the plan may be amended by a unilateral company decision to amend, and only by such a decision—and not, for example, by the unilateral decision of a third-party trustee or upon the approval of the union. Moreover, to the extent

that this procedure *is* the barest of procedures, that is because the Curtiss-Wright plan is the simplest of plans: a voluntarily maintained single-employer health plan that is administered by the employer and funded by the employer. More complicated plans, such as multiemployer plans, may have more complicated amendment procedures, and § 402(b)(3) was designed to cover them as well.

In any event, the literal terms of § 402(b)(3) are ultimately indifferent to the level of detail in an amendment procedure, or in an identification procedure for that matter. The provision requires only that there *be* an amendment procedure, which here there is. A "procedure," as that term is commonly understood, is a "particular way" of doing something, Webster's Third New International Dictionary 1807 (1976), or "a manner of proceeding," Random House Dictionary of the English Language 1542 (2d ed. 1987). Certainly a plan that says it may be amended only by a unilateral company decision adequately sets forth "a particular way" of making an amendment. Adequately, that is, with one refinement.

In order for an amendment procedure that says the plan may be amended by "[t]he Company" to make any sense, there must be some way of determining what it means for "[t]he Company" to make a decision to amend or, in the language of trust law, to "sufficiently manifest [its] intention" to amend. Restatement (Second) of Trusts § 331, Comment *c* (1957). After all, only natural persons are capable of making decisions. As Judge Roth suggested, however, principles of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company. Consider, for example, an ordinary sales contract between "Company X" and a third party. We would not think of regarding the contract as meaningless, and thus unenforceable, simply because it does not specify on its face exactly who within "Company X" has the power to enter into such an agreement or carry out its

terms. Rather, we would look to corporate law principles to give "Company X" content. See 2 W. Fletcher, Cyclopedia of Law of Private Corporations § 466, p. 505 (rev. ed. 1990) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers"). So too here.

In the end, perhaps the strongest argument for a textual reading of § 402(b)(3) is that to read it to require specification of individuals or bodies within a company would lead to improbable results. That is, it might lead to the invalidation of myriad amendment procedures that no one would think violate § 402(b)(3), especially those in multiemployer plans—which, as we said, § 402(b)(3) covers as well. For example, imagine a multiemployer plan that says "This Plan may be amended at any time by written agreement of two-thirds of the participating Companies, subject to the approval of the plan Trustees." This would seem to be a fairly robust amendment procedure, and we can imagine numerous variants of it. Yet, because our hypothetical procedure does not specify who within any of "the participating Companies" has authority to enter into such an amendment agreement (let alone what counts as the "approval of the plan Trustees"), respondents would say it is insufficiently specific to pass muster under § 402(b)(3). Congress could not have intended such a result.

## B

Curtiss-Wright's reservation clause thus satisfies the plain text of both requirements in § 402(b)(3). Respondents nonetheless argue that, in drafting § 402(b)(3), Congress intended amendment procedures to convey enough detail to serve beneficiaries' interest in knowing the terms of their plans. Ordinarily, we would be reluctant to indulge an argument based on legislative purpose where the text alone yields a clear answer, but we do so here because it is the argument the Court of Appeals found persuasive.

Section 402(b)(3)'s primary purpose is obviously functional: to ensure that every plan *has* a workable amendment procedure. This is clear from not only the face of the provision but also its placement in § 402(b), which lays out the requisite functional features of ERISA plans. 29 U. S. C. § 1102(b) (every ERISA plan shall have, in addition to an amendment procedure, "a procedure for establishing and carrying out a funding policy and method," "[a] procedure under the plan for the allocation of responsibilities for the operation and administration of the plan," and "[a] basis on which payments are made to and from the plan").

Requiring every plan to have a coherent amendment procedure serves several laudable goals. First, for a plan *not* to have such a procedure would risk rendering the plan forever unamendable under standard trust law principles. See Restatement (Second) of Trusts, *supra*, § 331(2). Second, such a requirement increases the likelihood that proposed plan amendments, which are fairly serious events, are recognized as such and given the special consideration they deserve. Finally, having an amendment procedure enables plan administrators, the people who manage the plan on a day-to-day level, to have a mechanism for sorting out, from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms, the bona fide amendments from those that are not. In fact, plan administrators may have a statutory responsibility to do this sorting out. See 29 U. S. C. § 1104(a)(1)(D) (plan administrators have a duty to run the plan "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [the statute]," which would include the amendment procedure provision). That Congress may have had plan administrators in mind is suggested by the fact that § 402(b)(3), and § 402(b) more generally, is located in the "fiduciary responsibility" section of ERISA. See 29 U. S. C. §§ 1101–1114.

Respondents argue that § 402(b)(3) was intended not only to ensure that every plan has an amendment procedure, but also to guarantee that the procedure conveys enough detail to enable beneficiaries to learn their rights and obligations under the plan at any time. Respondents are no doubt right that one of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time. But ERISA already *has* an elaborate scheme in place for enabling beneficiaries to learn their rights and obligations at any time, a scheme that is built around reliance on the face of written plan documents.

The basis of that scheme is another of ERISA's core functional requirements, that "[e]very employee benefit plan shall be established and maintained *pursuant to a written instrument.*" 29 U. S. C. § 1102(a)(1) (emphasis added). In the words of the key congressional report, "[a] written plan is to be required in order that every employee may, *on examining the plan documents,* determine exactly what his rights and obligations are under the plan." H. R. Rep. No. 93–1280, p. 297 (1974) (emphasis added). ERISA gives effect to this "written plan documents" scheme through a comprehensive set of "reporting and disclosure" requirements, see 29 U. S. C. §§ 1021–1031, of which § 402(b)(3) is not part. One provision, for example, requires that plan administrators periodically furnish beneficiaries with a Summary Plan Description, see 29 U. S. C. § 1024(b)(1), the purpose being to communicate to beneficiaries the essential information about the plan. Not surprisingly, the information that every SPD must contain includes the "name and address" of plan administrators and other plan fiduciaries, but not the names and addresses of those individuals with amendment authority. § 1022(b). The same provision also requires that plan administrators furnish beneficiaries with summaries of new amendments no later than 210 days after the end of the plan year in which the amendment is adopted. See § 1024(b)(1). Under ERISA, both Summary Plan Descriptions and plan

amendment summaries "shall be written in a manner calculated to be understood by the average plan participant." § 1022(a)(1).

More important, independent of any information automatically distributed to beneficiaries, ERISA requires that every plan administrator make available for inspection in the administrator's "principal office" and other designated locations a set of all currently operative, governing plan documents, see § 1024(b)(2), which necessarily includes any new, bona fide amendments. See also § 1024(b)(4) (requiring plan administrators, upon written request, to furnish beneficiaries with copies of governing plan documents for a reasonable copying charge). As indicated earlier, plan administrators appear to have a statutory responsibility actually to run the plan in accordance with the currently operative, governing plan documents and thus an independent incentive for obtaining new amendments as quickly as possible and for weeding out defective ones.

This may not be a foolproof informational scheme, although it is quite thorough. Either way, it is the scheme that Congress devised. And we do not think Congress intended it to be supplemented by a faraway provision in another part of the statute, least of all in a way that would lead to improbable results, *supra*, at 81.

In concluding that Curtiss-Wright's reservation clause sets forth a valid amendment procedure, we do not mean to imply that there is anything wrong with plan beneficiaries trying to prove that unfavorable plan amendments were not properly adopted and are thus invalid. This is exactly what respondents are trying to do here, and nothing in ERISA is designed to obstruct such efforts. But nothing in ERISA is designed to facilitate such efforts either. To be sure, some companies that have plans with the standard reservation clause may want to provide greater specification to their amendment procedures precisely to avoid such costly litigation. Or they may want to retain the flexibility that

designating "[t]he Company" (read in light of corporate law) provides them. But either way, this is simply a species of a larger dilemma companies face whenever they must designate who, on behalf of the company, may take legally binding actions that third parties may later have an interest in challenging as unauthorized. Cf. R. Clark, Corporate Law § 3.3.2 (1986). It is not a dilemma ERISA addresses. ERISA, rather, follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level.

### III

Having determined that the Curtiss-Wright plan satisfies § 402(b)(3), we do not reach the question of the proper remedy for a § 402(b)(3) violation. On remand, the Court of Appeals will have to decide the question that has always been at the heart of this case: whether Curtiss-Wright's valid amendment procedure—amendment "by the Company"— was complied with in this case. The answer will depend on a fact-intensive inquiry, under applicable corporate law principles, into what persons or committees within Curtiss-Wright possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision contained in the revised SPD. See 2 W. Fletcher, Cyclopedia of the Law of Private Corporations § 444, pp. 397–398 (1990) (authority may be by express delegation or it "may be inferred from circumstances or implied from the acquiescence of the corporation or its agents in a general course of business"). If the new plan provision is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions, such as the executive vice president's letters informing respondents of the termination, served to ratify the provision *ex post*. See *id.,* § 437.10, at 386.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*