In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1230

CAROL ASCHERMANN,

*Plaintiff-Appellant*,

*v.*

AETNA LIFE INSURANCE COMPANY, *et al*.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-00433-LJM-MJD—**Larry J. McKinney**, *Judge*.

ARGUED JUNE 6, 2012—DECIDED JULY 31, 2012

Before EASTERBROOK, *Chief Judge*, and WOOD and SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Carol Aschermann suffers from degenerating discs and spondylolisthesis. She had lumbar fusion operations in 2002 and 2004. Dmitry Arbuck, her pain-management specialist, believes that only the development of new medical procedures could alleviate her residual pain.

Until 2003 Aschermann worked for AstraZeneca Pharmaceuticals as a sales representative. *Christopher*

*v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2163–64 (2012), and *Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 563–68 (7th Cir. 2012), describe the nature of this job. Back pain left her unable to perform its duties. Between 2003 and 2009 she received disability payments under AstraZeneca's disability plan, a welfare-benefit plan governed by the Employee Retirement Income Security Act (ERISA). Terms of the disability plan are contained in a group insurance policy issued by Lumbermens Mutual Casualty Company. For two years from the onset of a disability, the plan provides benefits to a participant who can't do her old job. After that, the question becomes whether she can perform any job in the economy as a whole. Lumbermens stopped paying disability benefits to Aschermann in fall 2009, concluding that she could do sedentary work.

The district court held that, to upset this decision, Aschermann must establish that it is arbitrary and capricious. 2010 U.S. Dist. LEXIS 121841 (S.D. Ind. Nov. 12, 2010). After reviewing the documents that she submitted to Aetna Life Insurance Co., which administers the group plan on behalf of Lumbermens, the court held that the decision to end her disability benefits was neither arbitrary nor capricious, and it entered summary judgment in defendants' favor. 2011 U.S. Dist. LEXIS 149785 (S.D. Ind. Dec. 30, 2011). Aschermann does not deny that her education (she has a B.S. in psychology and a master's degree in social work) and experience suit her for many desk-bound positions, but she contends that Aetna erred in finding that she is able to perform any of them. Dr. Arbuck believes that she cannot work

more than four hours a day. Aetna concedes that, if that is so, she is entitled to disability benefits.

The first question we must decide is whether the district judge should have made an independent decision, on a record newly compiled in federal court, rather than reviewing the administrative record under a deferential standard. Independent decision—often though misleadingly called "de novo review", see *Krolnik v. Prudential Insurance Co.*, 570 F.3d 841, 843 (7th Cir. 2009)—is required in ERISA litigation when the plan does not provide differently. See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–13 (1989). But when the plan confers discretion to interpret and implement its terms, deferential judicial review is appropriate. *Id.* at 111, 115; see also *Diaz v. Prudential Insurance Co.*, 424 F.3d 635 (7th Cir. 2005). AstraZeneca's plan bestows such discretion on its administrator, the AstraZeneca Administration Committee, plus any insurer that underwrites the benefits. The group policy confers discretion on Lumbermens. Aschermann concedes that deferential review would be appropriate had Lumbermens made the decision in question. She observes, however, that neither the plan nor the group policy mentions Aetna, which acts as Lumbermens' agent. (Lumbermens is withdrawing from the insurance business. To assist in unwinding its positions, it engaged third parties to administer policies that it could not cancel.) Aschermann contends that only decisions by a person whom the plan names are subject to deferential review.

This can be decomposed into two questions: first, is a written delegation essential; second, is this particular

delegation authorized? We reserved the first question in *Semien v. Life Insurance Co. of North America*, 436 F.3d 805, 811 (7th Cir. 2006), and need not answer it here either. Lumbermens and Aetna's predecessor signed a document captioned "Administrative Services Agreement", which transfers to Aetna all of Lumbermens' day-to-day duties and discretion.[†]

This leaves the question whether Lumbermens exceeded its authority in appointing an agent. The district court said no, because the plan allows sub-delegation. But the language the district judge quoted permits "[t]he Plan Administrator" to delegate, and the Plan Administrator is AstraZeneca Administration Committee, not Lumbermens. Aschermann also maintains that this sub-delegation language appears in the summary plan description, which differs from the plan itself. See *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011). It isn't clear that Aschermann is right about this; the language is in a "summary" section of the plan document, but the first page in the summary suggests that it is a statement

---

[†] As part of the process of withdrawing from the insurance business, Lumbermens created a subsidiary, NATLSCO, Inc., to perform administrative services. In 2003 Lumbermens sold NATLSCO to Platinum Equity LLC, which renamed NATLSCO as Broadspire Services. Aetna purchased Broadspire's disability-administration business from Platinum Concepts in April 2006 and since then has administered Lumbermens' open disability claims. These details do not matter to our litigation; what does matter is that the documentary chain is established.

of basic terms, with more abstruse ones relegated to the back of the book. There is no reason why an employer cannot make a summary plan description be part of the plan itself and thus reduce the length of the paperwork and the potential for disagreement between the summary and the full plan (though this is not how things had been done in *Amara*). See *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). Because Aschermann did not argue in the district court that the language in the "summary" section of the document should be ignored, the defendants were not called on to explicate the relation between the summary and the full plan. But it is unnecessary to run this to ground, if Lumbermens can re-delegate discretion it enjoys under the group policy.

*Firestone* derived its presumption of independent judicial decision-making from principles of trust law, observing that federal courts supply operating details under ERISA by using common-law principles. This leads us to ask whether the holder of a discretionary power may delegate it, in the absence of contractual language resolving that question one way or the other. According to the *Restatement (Second) of Contracts* §318(1) (1981), delegation does not depend on an express grant; instead it is permissible unless it would be "contrary to public policy or the terms of [a] promise." Nothing in AstraZeneca's plan, or Lumbermens' group policy, forbids delegation, and Aschermann does not argue that delegation would be contrary to any public policy. To the contrary, Aschermann concedes that ERISA allows delegation; she argues only that AstraZeneca's plan does not authorize it expressly.

At common law, delegation is not allowed for personal-services contracts: if the Lyric Opera hires Plácido Domingo to sing Hoffmann, he can't send Neil Shicoff in his stead, even though many opera buffs consider Shicoff the better interpreter of that role. See *Restatement (Third) of Agency* §3.04(3) and comment c (2006). The group policy is not a personal-services contract, however; Aschermann has no interest in who, precisely, makes the decision. Like any other corporation, Lumbermens can act only through people. It must designate someone, or some group, to evaluate applications for disability benefits; Aschermann has no right to choose who among Lumbermens' staff evaluates her application. By delegating this function to Aetna, Lumbermens has not done anything fundamentally different from choosing a particular working group within its internal hierarchy. That Aetna proceeds as an independent contractor on behalf of Lumbermens, rather than as an employee of Lumbermens, is of no moment under the common law or any of ERISA's provisions.

Delegation could cause a problem by creating or aggravating a conflict of interest. Decision by a conflicted delegate requires closer judicial review. See *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008). But the delegation from Lumbermens to Aetna reduced any potential for conflict. Lumbermens, as an underwriter, benefits when claims are denied (or, as here, previously granted benefits are terminated). Aetna, as a third-party administrator, has no financial interest: when it grants or continues benefits, Lumbermens pays. Aetna gains from efficient and accurate resolution of

claims—and any temptation to cut corners would lead Aetna to grant (or continue) benefits in order to avoid expensive litigation such as this suit. From Aschermann's perspective, Aetna should be preferable to Lumbermens as decisionmaker. We therefore agree with the district court that the judicial role is deferential. Aetna's decision must be sustained unless it is arbitrary and capricious.

Aschermann's claim for benefits rests on her back problems (well established in the medical records) plus Dr. Arbuck's conclusion that she cannot work more than four hours a day. But Arbuck is a pain specialist, whose opinions rely substantially on Aschermann's self-evaluation of her pain, rather than a vocational expert; what jobs a person can do depends as much on the demands of the workplace as on capacity to tolerate pain. Aschermann's pain is alleviated when she lies down; some sedentary jobs allow their occupants to recline or stretch occasionally. Millions of people with back pain are gainfully employed, and many people return to work after lumbar fusion operations. That Aschermann has serious back problems, and residual pain, is not conclusive on the question whether she can work.

In 2005, a year after Aschermann's second operation, Aetna sent her medical file to Martin G. Mendelssohn, an orthopedic surgeon. Mendelssohn concluded that the clinical evidence (including a report by the surgeon who performed the second operation and noted Aschermann's statement that in spring 2005, six months after the operation, only "mild to moderate" pain remained) did not demonstrate inability to do sedentary

work. In 2006 Aetna obtained an employability assessment report (comparable to the testimony of a vocational expert in a Social Security disability case) for Aschermann; the report concluded that a person with her limitations could perform sedentary jobs. That same year Aetna sent Aschermann's medical file to Lawrence Blumberg, another orthopedic surgeon. He agreed with Dr. Mendelssohn. In 2009, while considering whether to terminate Aschermann's benefits, Aetna sent the file to Anthony Riso, a specialist in pain management. Riso agreed with Mendelssohn and Blumberg. Riso also spoke with Arbuck and reported that Arbuck now agreed with this evaluation. In June 2009 Aetna commissioned a labor market survey, which concluded that vocations in the medical, social-work, and press-relations fields were available. Only after receiving all of this advice did Aetna end Aschermann's disability benefits.

Physicians disagree—Arbuck is on Aschermann's side (Riso misunderstood him; we'll return to that subject), while Mendelssohn, Blumberg, and Riso think that she can work. It is not arbitrary or capricious to resolve such a conflict in either direction. Aschermann contends, however, that Aetna stumbled procedurally and that she is entitled to a do-over so that she can present additional evidence.

ERISA requires plans to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant". 29 U.S.C. §1133(1). Notice allows the claimant to cure

any (curable) deficiency during the required "reasonable opportunity … for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. §1133(2). Aschermann maintains that Aetna provided inadequate notice, which prevented her from employing its appeals process to best effect. (She does not, however, maintain that there was any problem in Aetna's pre-decisional processes. Aschermann and Aetna had been discussing her situation for months, and she knew the criteria by which her submissions would be evaluated.)

Aetna's letter of August 28, 2009, announcing the termination of Aschermann's disability benefits, gives this reason for the decision:

> Medical records reviewed for your claim included an Attending Physician Statement submitted by Dr. Arbuck dated 6/25/08 with a medication list, Meridian Health Group, Progress notes dated 6/11/08 through 1/29/08, a medication refill dated 3/11/07 and lab test results dated 7/20/06, and Attending Physician Statement completed on 1/13/06 by Dr. Arbuck. Because all of these medical reports are outdated we referred the medical review of your claim to a Peer Reviewing Physician specializing in Anesthesiology/Pain Management who also performed a Peer to Peer consult with Dr. Arbuck. During the Peer to Peer consult with Dr. Arbuck on 1/15/09 at 5:35 EST, Dr. Arbuck stated that you would be capable of performing sedentary work as long as you did not have to lift, bend stoop or squat.

> Based on the provided documentation and tele-
> phonic consultation the documentation fails to
> support a functional impairment that would
> preclude you from performing any occupation.

This explanation does not mention the Mendelssohn
or Blumberg reports, or the bulk of Riso's. Aschermann
contends that it led her to think that all she needed to
do was to get a new letter from Arbuck reiterating his
view that she has a time limit (four hours daily) as well
as limits on lifting, bending, stooping, and squatting.
Aschermann asked Arbuck for a new letter, which he
provided, stating that Riso had misunderstood him and
that he stands by his view that she cannot perform the
tasks required for a sedentary job. That's the *only* new
evidence Aschermann submitted, and on December 1,
2009, Aetna denied her administrative appeal in a letter
that canvasses the medical file and lays out the reasons
in much more detail than the letter of August 28 had done.

Aschermann says that a letter in August as compre-
hensive as the one in December would have led her to
submit new medical evidence. To get new evidence (as
opposed to a new letter from Dr. Arbuck), Aschermann
would have needed to undergo new tests. That
would have caused delay, and Aetna's staff told her
that evaluating the new evidence would take time on top
of that. Hoping to have benefits restored swiftly,
Aschermann chose to stand on the existing medical
record, supplemented only by Arbuck's letter. Regretting
that choice, Aschermann says that she would have acted
differently had the letter of August 2009 made it clear

that Aetna's decision rested on something more than Riso's tin ear. Aetna replies that three phone conversations between its staff and Aschermann in September and October 2009 supplied what she thinks is missing from the letter. Summaries of these conversations are in the record, but they provide Aetna's understanding rather than Aschermann's; given the posture of the litigation, it is best to stick with the letter itself.

And that letter has more substance than Aschermann recognizes. For one thing, it says that "all of these medical records are outdated". Aschermann knew that Aetna had her entire medical file and so could tell that the few documents to which the letter referred were just illustrations. It says that the documents considered "included" those listed, not that *only* the listed documents had been considered. The most recent document from any back specialist, other than the two that Aetna had retained in 2005 and 2006, was created in April 2005, when the surgeon who performed her second operation reported that her pain had been reduced by the operation of November 2004 and was then (by Aschermann's own account) mild to moderate. Since April 2005 there had been no tests, no x-rays, no hands-on evaluation by any orthopedic specialist. A lot can happen in four years, and Aetna's blunt statement that "all of these medical records are outdated" tells the recipient that something recent was essential.

The letter also told Aschermann that "[i]f you disagree with this determination, in whole or in part, you may file a written request for a review of your claim. You must:

1) Provide a written appeal:

   State the reasons you believe the claim
   should be treated differently. Please include
   additional facts or pertinent information to
   substantiate your position.

2) Provide us with current medical documenta-
   tion from the health care provider which: In-
   cludes additional facts or pertinent informa-
   tion to substantiate your position. Estab-
   lishes that you are unable to work in any
   occupation as defined on the previous page.
   Includes medical data such as: diagnostic
   test results, to support the diagnosis and claim
   for continued disability; and provides specific
   functional abilities, including any and all
   restrictions and limitations."

Aschermann wants us to treat this as irrelevant boiler-
plate. Formulaic it may be—though the sentence frag-
ment "Includes additional facts or pertinent information
to substantiate your position" is in boldface and larger
type than the sentences immediately before and after,
and the spacing does not quite line up, which im-
plies that it may have been inserted into a template.
But formulaic does not mean irrelevant. Aetna told
Aschermann that it wanted new diagnostic test results
and other recent information. Language gets called
"boilerplate" when it is used frequently, and we are
sure that Aetna *does* use this language frequently, because
it will steer many claimants in the right direction.

The statement that existing records were outdated,
coupled with a request for new diagnostic tests, gave

Aschermann a "reasonable opportunity" to supplement the file and receive a "full and fair review" within Aetna's bureaucracy. Aschermann discussed with Aetna's staff the possibility of undergoing new tests and submitting new medical findings. Aetna's reply—that it would consider whatever Aschermann submitted, but that waiting for more tests, followed by more internal review, equals delay—cannot be described as a flaw in the administrative process. Honesty is a virtue, not a problem. Given the record that Aetna evaluated, its decision was not arbitrary or capricious.

Aschermann's other arguments have been considered but do not require discussion.

AFFIRMED