T.C. Memo. 2012-300

UNITED STATES TAX COURT

CHURCHILL, LTD. EMPLOYEE STOCK OWNERSHIP
PLAN & TRUST, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25833-10R.                    Filed October 25, 2012.

Paul F. Christoffers, for petitioner.

Matthew M. Johnson, for respondent.

MEMORANDUM OPINION

GERBER, Judge:  In this declaratory judgment proceeding under section 7476, petitioner challenges respondent's August 31, 2010, revocation letter determining that for its 1995 year and subsequent plan years the plan was not qualified under section 401(a) and that the related trust is not exempt under

[*2] section 501(a).[1]  The broad question we consider is whether there was an abuse

of discretion in respondent's determination.  To decide that question we consider

whether the plan met certain statutory requirements and/or whether the plan was

timely or properly amended and whether a qualified appraiser was used for required

valuations.

Background[2]

Churchill, Ltd., is an Iowa corporation with its principal place of business in

Carlisle, Iowa, at the time the petition was filed.  Churchill, Ltd., is the employer,

plan sponsor, and plan administrator of the plan.  During all years under

consideration, Keith Churchill was the president of Churchill, Ltd., and a participant

of the plan.  For relevant years, the following individuals served as the plan trustee:

Gerald Ratigan (July 1 to September 30, 1994); Kathleen Churchill (September 30,

1994, to July 1, 2001); and Mr. Churchill (July 1, 2001, to present).

---

[1]All section references are to the Internal Revenue Code in effect for the period under consideration.  Rule references are to the Tax Court's Rules of Practice and Procedure.

[2]The parties submitted this case fully stipulated under Rule 122 on the basis of the pleadings and administrative record in accord with Rule 217(a).

[*3]   The plan became effective July 1, 1981, and on November 28, 1988, respondent issued a favorable determination letter.  The plan was amended and restated on November 18, 1989 (1989 plan), effective for the fiscal year beginning July 1, 1989.  The 1989 plan was amended on June 23, 1997, and June 5, 1998.  On September 13, 2001, the 1989 plan was amended and restated (2001 plan).

The 1989 plan and its amendments did not include a primary direction or control test in the definition of a "leased employee".  The 2001 plan did include a primary direction or control test in the definition of a "leased employee".  Section 414(u) requires a qualified plan to include provisions concerning special rules for veterans' reemployment rights and for differential wage payments to members on active duty under the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. No. 103-353, 108 Stat. 3149.  The 1989 plan and its amendments did not include provisions complying with section 414(u); however, the 2001 plan did by reference.

The 1989 plan requires that accrued benefits be distributed or installment payments begin not later than April 1 of the calendar year following the calendar year in which the employee attains age 70½.  The 2001 plan and its amendment require that the accrued benefits be distributed or installment payments begin not

[*4] later than April 1 of the calendar year following the calendar year when the employee attains age 70½ or when the employee retires.

The 1989 plan defines "employer contributions" for "Highly Compensated Employees" as employee and employer matching contributions and compensation to "Family Members", but the family attribution requirement does not apply to "Nonhighly Compensated Employees". The family attribution approach in the 1989 plan was eliminated in the 2001 plan.

Section 24 of the 1989 plan defined "compensation" as follows:

Compensation paid by the Employer to the Participant during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Participant's Form W-2 and shall include compensation which is not currently includible in the Participant's gross income by reason of the application of sections 125, 402(a)(8), 402(h)(1)(B), or 403(b) of the Code, but shall not exceed $200,000 for any Plan Year.

An amendment to the 1989 plan, effective July 1, 1994, defined "compensation" as including amounts contributed or deferred by the employer at the election of the employee under sections 125 and 147.

Section 24 of the 2001 plan defined "compensation" as follows:

All W-2 wages paid to the Participant by the employer for the Plan Year and all earned income paid to self-employed individuals who are considered to be employees under the provisions of the Internal Revenue Code section 401(c)(1). Compensation also includes any elective deferral and any amount which is contributed or deferred by

> **[*5]** the Employer under the provisions of sections 125 and 401(k).
> Total compensation does not include any amounts paid to a Participant
> in excess of $200,000 plus any future cost of living or inflation
> increases permitted by the Internal Revenue Service.

The 2001 plan definition was amended effective July 1, 2001, reducing the $200,000 limitation to amounts in excess of $150,000.  The 2001 plan also defined "compensation" to include any elective deferral and amounts contributed or deferred by the employer under sections 125 and 401(k).  A September 13, 2001, amendment of the 2001 plan, effective July 1, 2001, set forth additional conditions concerning "highly compensated employees", including the condition that "compensation" as used in the plan is to be "compensation" as defined in section 415(c)(3), "including elective or salary reduction contributions to a cafeteria plan, cash or deferred arrangement or tax-sheltered annuity."

The 1989 plan provided for vesting of benefits before the employee's being entitled to retire or the employee's death.  No portion of the employee's benefits vested, before the employee had two years of service.  After two years of service 20% of the employee's benefits vested, and an additional 20% per year vested until the benefits were 100% vested.  The 2001 plan also provided for vesting of benefits before the employee's being entitled to retire or the employee's death.  Under the 2001 plan there was no vesting before three years of service and then

**[\*6]** the vesting percentage increased by 5% or 10% increments until the employee was fully vested after 11 years of service. No provision was made in the 1989 or 2001 plan for special vesting if the plan was considered "top-heavy" under section 416. Stephen Thielking was chosen to appraise Churchill, Ltd.,'s common stock. Mr. Thielking's qualifications were not stated in the appraisals. In addition to performing the appraisals, Thielking also prepared and drafted the plans' documents, and he prepared Forms 5500, Annual Return/Report of Employee Benefit Plan, the plans' summary plan descriptions, and summary annual reports. He also computed the coverage testings for the Forms 5500. Finally, Thielking prepared participant account statements and prepared and maintained the plans' trust records.

## Discussion

The underlying facts in this proceeding are derived from the administrative record, which the parties submitted fully stipulated. In this declaratory judgment proceeding we review respondent's determination that the plan was not qualified. The standard for our review was set forth in Buzzetta Constr. Corp. v. Commissioner, 92 T.C. 641, 648 (1989), as follows:

> When reviewing discretionary administrative acts, however, this Court may not substitute its judgment for that of the Commissioner. The exercise of discretionary power will not be disturbed unless the

[*7] Commissioner has abused his discretion, i.e., his determination is unreasonable, arbitrary, or capricious.  Whether the Commissioner has abused his discretion is a question of fact, and petitioner's burden of proof of abuse of discretion is greater than that of the usual preponderance of the evidence.  Estate of Gardner v. Commissioner, 82 T.C. 989, 1000 (1984); Oakton Distributors, Inc. v. Commissioner, 73 T.C. 182, 188 (1979).

Further, "[i]n order for a plan to be qualified, both its terms and its operations must meet the statutory requirements."  Id. at 646.

Respondent's determination was based on several reasons that the parties have addressed on brief.  We consider each reason separately.

I.  Whether the Plan Was Timely or Properly Amended

A.  In General

Respondent argues that petitioner failed to timely or properly amend the plan.  Petitioner argues that employee benefit rights were restored to appropriate levels under the statutes and regulations.  To the extent that the plan was not timely amended, petitioner argues that the Commissioner normally allows retroactive amendments to comply with various statutory changes.  Respondent counters that, even if the amendments petitioner made could be considered timely, the amendments did not adequately comport with the statutory changes/requirements.

[*8] During the 1990s and into the year 2000 various legislation affected existing employee benefit plans. Those legislative enactments are sometimes commonly and collectively known as GUST.[3] Where the GUST legislative changes placed plans in a position of noncompliance, section 401(b) permits a remedial period within which to make plan amendments to comply with new legislation. The GUST remedial amendment period for the type of plan under consideration here ended on the later of February 28, 2002, or the last day of the first plan year beginning on or after January 1, 2001. See Rev. Proc. 2001-55, 2001-2 C.B. 552, modifying Rev. Proc. 2000-27, 2000-1 C. B. 1272. Because of the complexity and number of statutory changes to be considered in this case, we individually address each aspect of the plan that respondent determined not to be in compliance.

---

[3]GUST is a collective acronym for the following legislation: (1) Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), which implemented the Uruguay Round of General Agreement on Tariffs and Trade; (2) Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. No. 103-353, 108 Stat. 3149; (3) the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, 110 Stat. 1755; (4) Taxpayer Relief Act of 1997 (TRA 97), Pub. L. No. 105-34, 111 Stat. 788; (5) Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, 112 Stat. 685; and (6) Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, app. G, 114 Stat. at 2763A-587 (2000).

**[\*9]**   B.  <u>SBJPA Statutory Changes That Impacted the Plan</u>

The Small Business Job Protection Act of 1996 (SBJPA), Pub. L. No. 104-188, 110 Stat. 1755, as pertinent to this case, changed plan requirements under:  (1) section 414(n)(2)(C) concerning the definition of "employee leasing"; (2) section 414(u) concerning special rules for veterans; (3) section 401(a)(9) concerning required minimum distributions; (4) section 414(q)(6) concerning family aggregation rules in connection with "highly compensated employees"; and (5) section 415(c)(3)(D) concerning a participant's compensation.

   1.  <u>Employee Leasing</u>

Section 414(n) concerns circumstances where a "leased employee" performs services for another person (recipient) and may be treated as the recipient's employee for certain employee benefit provisions.  SBJPA sec. 1492(b)(9)(C), 110 Stat. at 1798, amended section 414(n)(2)(C) for years after 1996 with respect to the test to determine whether a "leased employee" was to be considered the recipient's employee.  The new test for whether a "leased employee" became the recipient's employee was based upon whether the "services are performed under the primary direction or control by the recipient."

Petitioner's 1989 plan and amendments did not include the primary direction and control test.  Petitioner's 2001 plan added the primary direction and

[*10] control test to the definition of "leased employee", but the amendment to the 2001 plan became effective for years beginning July 1, 2001, and did not apply to the intervening years from December 31, 1996, through June 30, 2001.

On brief petitioner fails to directly address the fact that the plan was not retroactively amended to address statutory changes for the intervening years before July 1, 2001. Petitioner makes the broad argument that the Commissioner announced in Rev. Rul. 82-66, 1982-1 C.B. 61, that retroactive amendments will be permitted under certain circumstances and that Rev. Proc. 2007-44, sec. 18.01, 2007-2 C.B. 54, 69, provides that the last day of the remedial amendment period was January 31, 2011, and that all necessary corrections were made by that date. Petitioner's argument misses the point that no correcting amendment was made for the intervening plan years.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

## 2. Special Rules for Veterans

Section 414(u) contains provisions to restore certain pension, profit-sharing, and similar benefits that would have accrued but for the employee's absence because of "qualified military service." These provisions were effective

[*11] for all plan years beginning after December 12, 1994. Here again the 1989 plan and its amendments did not incorporate the section 414(u) provisions. The 2001 plan was amended to reflect the provisions, but only for years beginning July 1, 2001. The plan for intervening years after December 12, 1994, was not amended. Petitioner makes no better an argument as to the failure to address the section 414(u) changes for years before July 1, 2001, and accordingly has not shown that respondent's reliance on this aspect of the determination as the basis for revocation was unreasonable or arbitrary.

### 3. Required Minimum Distributions

Section 401(a)(9) provides for required minimum distributions and, additionally, that the entire interest of each employee will be distributed not later than the required beginning date or beginning not later than the required beginning date over the employee's or employee's designated beneficiary's life. See sec. 401(a)(9)(A)(i) and (ii). SBJPA sec. 1404, 110 Stat. at 1791, changed the required beginning date for participants other than a "5-percent owner" to April 1 of the year following the year in which the participant reaches age 70½ or, if later, the year in which the employee retires. See sec. 401(a)(9)(C)(i) and (ii). This change was required for plan years beginning after December 31, 1996. With respect to "5-percent owners", SBJPA sec. 1404 required the beginning distribution date to

**[\*12]** be April 1 of the calendar year following the year in which the participant reaches age 70½.

The 2001 plan, including amendments, did not restrict the required distribution beginning date for "5-percent owners" to April 1 of the calendar year following the year in which the participant reaches age 70½. Petitioner argues that the plan stated that "Distributions from the plan will be made in accordance with the requirements of the regulations under Internal Revenue Code section 401(a)(9), including the minimum distribution requirements of section 1.401(a)(9)-5 of the regulations."

Even if the plan contained the quoted statement, it would be insufficient to apprise plan participants of the terms and conditions of the plan. Congress established the writing requirement so that employees, by examining the plan document, can determine exactly what their rights and obligations are under the plan. See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995); H.R. Rept. No. 93-1280, at 297 (1974), 1974-3 C.B. 415, 458. A generic statement in a plan that indicates that it complies with the Internal Revenue Code or even a specific section thereof does not adequately meet the congressional mandate.

**[*13]** Accordingly, petitioner has not shown that respondent's reliance on the plan's omission regarding "5-percent owners" as part of the basis supporting the determination for revocation was unreasonable or arbitrary.

### 4. Family Aggregation Rules

Section 414(q)(6) concerned family aggregation rules in connection with the determination of the amount of compensation paid to certain "highly compensated employee[s]." SBJPA sec. 1431(b)(1), 110 Stat. at 1803, repealed the family aggregation rules effective for plan years after December 31, 1996. See id. sec. 1431(d)(2).

The 1989 plan, as amended, did include the family aggregation rules. The 2001 plan eliminated the family aggregation rules in accordance with the repeal. However, the 2001 plan was not effective until July 1, 2001. The plan, accordingly, provided for the use of an incorrect method of calculating compensation from the effective date of the repeal from December 31, 1996, until July 1, 2001.

Here again, petitioner argues that the plan as it exists does not require aggregation in the computation and that respondent could allow retroactive application of the corrected plan. Petitioner's argument misses the point in that no

**[*14]** correcting amendment was made applicable for the intervening plan years and there is no indication that petitioner applied for retroactive application.

Accordingly, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

### 5. Participant Compensation

Section 415(c)(3)(D) concerning "participant's compensation" was added by SBJPA sec. 1434(a), 110 Stat. at 1807, and was effective for plan years beginning after December 31, 1997. In essence, section 415(c)(3)(D) required that certain deferrals be included in a "participant's compensation". Section 415(c)(3)(D) generally defines elective deferrals as those defined in section 402(g)(3) and any amount deferred by an employer at the election of the employee that is not includible in gross income.

The 1989 plan defined "compensation" as follows:

Compensation paid by the Employer to the Participant during the taxable year ending with or within the Plan Year which is required to be reported as wages on the Participant's Form W-2 and shall include compensation which is not currently includible in the Participant's gross income by reason of the application of sections 125, 402(a)(8), 402(h)(1)(B), or 403(b) of the Code, but shall not exceed $200,000 for any Plan Year.

[*15] In the second amendment to the 1989 plan the definition of "compensation" was amended to include "any amount which is contributed or deferred by the Employer at the election of the employee by reason of sections 125 and 147 of the Code."

The second amendment to the 1989 plan addressed some of the changes to the plan's definition of "compensation" by enactment of section 415(c)(3)(D) but failed to include amounts which are contributed or deferred by the employer at the election of the employee and which are not includible in the gross income of the employee within the meaning of section 457.

Respondent contends that the plan was therefore not in compliance with the SBJPA as to this item. Petitioner made no argument on brief concerning this item and has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

C. Community Renewal Tax Relief Act of 2000 (CRA) Statutory Changes That Affected The Plan

The Community Renewal Tax Relief Act of 2000 (CRA), appendix G of the Consolidated Appropriations Act, 2001, Pub. L. No. 106-554, 114 Stat. at 2763A-587 (2001), made two changes as pertinent to this case, as follows.

First, section 415(c)(3)(D)(ii) was amended by CRA sec. 314(e), 114 Stat. at 2763A-643, to require that "compensation" include any amount contributed or

**[\*16]** deferred by an employer at the election of the employee and which is not includible in the gross income of the employee by reason of section 132(f)(4). See Christy & Swan Profit Sharing Plan v. Commissioner, T.C. Memo. 2011-62. Section 132(f)(4) provides: "No constructive receipt. No amount shall be included in the gross income of an employee solely because the employee may choose between any qualified transportation fringe (other than a qualified bicycle commuting reimbursement) and compensation which would otherwise be includible in gross income of such employee." The plans under consideration, as amended, do not address the CRA changes or reference section 132(f)(4). Respondent contends that the failure to address those changes caused the plans' definitions of "compensation" to fall short of the requirements of section 415 and, in turn, the requirements of section 401(a)(17) for all limitation years beginning July 1, 1998, throughout the period under consideration.

Respondent contends that the plan was therefore not in compliance with the changes the CRA made to the definition of "compensation" as to this item. Petitioner made no argument on brief concerning this item and has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

**[\*17]**  Second, section 414(q) defines "compensation" as it is used in section 415(c)(3) with respect to whether a person is a "highly compensated employee." Respondent contends that the plan fails to meet the requirements of section 414(q) and, in turn, sections 415(c)(3) and 401(a)(4) for all limitation years beginning sometime in 1998.[4]

Petitioner contends that the plan's definition does meet the statutory mandate. Petitioner quotes the following definition of a "highly compensated employee" from the plan in support of its argument:  "An Employee who was a five percent owner at any time during the current Plan Year or the preceding Plan Year, or for the preceding Plan Year had compensation from the Employer in excess of $80,000." That blanket quote from the plan falls far short of the detailed definition of  a "highly compensated employee" as set forth in sections 414(q) and 415(c)(3).

Petitioner's explanation does not show that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

---

[4]Respondent also notes that the changes required by TRA 97 sec. 1526(c), 111 Stat. at 1073, have not been made.

**[*18]** D.  Tax Reform Act of 1986 Changes That Affected the Plan

The Tax Reform Act of 1986 (TRA 86), Pub. L. No. 99-514, 100 Stat. 2085, made two changes pertinent to this case, as follows.  First, section 411, concerning the minimum vesting standard, was changed by TRA 86.  Before the change, effective December 31, 1988, section 411(a)(2) provided several ways by which a plan could satisfy the minimum vesting provisions.  One method of vesting included the allowance of 10% of the employee's accrued benefits derived from employer contributions to vest after 10 years of service.  Another method involved the vesting of benefits derived from employer contributions in accordance with a schedule providing for benefit levels during a period of 5 to 15 years of service.  TRA 86 sec. 1113(a), 100 Stat. at 2446, amended section 411(a)(2), as pertinent to this case, to provide that for a plan to qualify, the employee's rights under the plan would have to vest and the benefits from the employer contributions would have to be nonforfeitable when the employee completes five years of service or an employee becomes vested in accordance with a three- to seven-year vesting schedule.  These two means for meeting the vesting requirements were in effect before July 1, 2001.

The 1989 plan, including amendments, complied with the section 411 minimum vesting requirements.  The 2001 plan, however, amended the plan's

**[*19]** vesting schedule to an 11-year graduated vesting schedule which provided that 40% of benefits from employer contributions would become nonforfeitable upon the completion of 4 years of service, with benefit increments to reach 100% after the completion of 11 years of service. Respondent determined that the plan did not comply with section 411 beginning July 1, 2001, and for subsequent years and, in part, based the revocation upon that determination.

Petitioner, in response to respondent's determination with respect to the 11-year vesting schedule, simply explains: "[t]he Plan provides for 2 to 6 years vesting per Code section 411(a)(2)(B)(iii)." Respondent counters that, in spite of petitioner's statement, the plan in section 13 provides for an 11-year minimum vesting schedule. Petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

Second, section 416 provides that a trust shall not be a qualified section 501(a) trust if its plan is "top-heavy", unless the plan meets the "3-year vesting" or "6-year graded" requirements of section 416(b)(1). As already noted, before the 2001 plan became effective, the 1989 plan, including amendments, complied with the requirements of sections 411 and 416(b)(2). Respondent's determination, in part, was based on the fact that the 2001 plan contained an 11-year minimum

[*20] vesting schedule which would not remedy a section 416 loss of qualification of the trust if the plan became "top-heavy". Respondent notes that if the plan becomes "top-heavy", a non-highly-compensated plan participant could not vest as rapidly as required under section 416(b)(1). Petitioner makes the same argument for section 416 as was made for section 411, above. Here, again, petitioner has not shown that respondent's reliance on this part of the determination as part of the basis for revocation was unreasonable or arbitrary.

II. <u>Whether Petitioner Failed To Use an Independent/Qualified Appraiser To Perform Valuations of the Securities Held by the Trust</u>

Section 401(a)(28)(C) provides that all valuations of securities that are not readily tradable on an established securities market must be performed by an "independent appraiser" and that the standards for appraisers are similar to those set forth in the regulations promulgated under section 170(a)(1). Without going into all of the standards that are set forth in the statutes and regulations, we focus upon the specific aspects that respondent relied upon to determine that the appraiser was not independent and petitioner's response to same.

Respondent's first point is that Thielking, the person chosen by petitioner to appraise its common stock for 2003, failed to list or disclose his qualifications as required by section 1.170A-13(c)(3)(ii)(F) and (5)(i)(B), Income Tax Regs.

[*21] Respondent points out that Thielking did not set forth his "background, experience, education, and membership, if any, in professional appraisal associations as required" by the above-cited regulations. The only statement of Thielking's background or qualifications set forth in the plan is that Thielking "is an accountant who is familiar with the assets being appraised."

Petitioner argues that there is no requirement that the appraiser's qualifications be set forth or disclosed annually. Petitioner also contends that Thielking was in all other respects a person who was "independent" as set forth in the statute, regulations, and respondent's announcements on the subject.

Thielking was the person selected to appraise common stock of a company's employee stock ownership plan (ESOP) in another case before this Court. In that case, involving similar taxable years, this Court addressed Thielking's failure to set forth his qualifications as follows:

> Petitioner asserts that Thielking was a permissible appraiser of the ESOT's stock in petitioner. We hold otherwise. Section 401(a)(28)(C) provides that all employer securities which are not readily tradable on an established securities market must be valued by an "independent appraiser". Since petitioner's stock is not traded on an established securities market, an independent appraiser had to value the ESOT's holdings of that stock. As relevant here, an "independent appraiser" means a "qualified appraiser" as defined by section 1.170A-13(c)(5)(i), Income Tax Regs.

**[\*22]**      The ESOP fails at least two requirements of that section. First, section 1.170A-13(c)(5)(i), Income Tax Regs., requires that the appraisal summary contain a declaration that the individual holds himself out to the public as an appraiser. The appraisal letters covering the 2001 through 2003 plan years state that "The undersigned holds himself out to be an appraiser". However, there is no signature below that statement on any of the letters (there is an unsigned line for a signature with the word "appraiser" typed below). Second, section 1.170A-13(c)(3)(ii)(F) and (5)(i)(B), Income Tax Regs., requires that the qualified appraiser who signs the appraisal must list his or her background, experience, education, and membership, if any, in professional appraisal associations. The appraisal here is not signed, and the appraisal summary does not list the referenced information.

Hollen v. Commissioner, T.C. Memo. 2011-2, slip op. at 9-10, aff'd, 437 Fed. Appx. 525 (8th Cir. 2011). Thielking's failure to set forth his qualifications was part of the basis for this Court's holding that the common stock in that case was not appraised by a "qualified appraiser".

The circumstances in Hollen were substantially similar to the circumstances in this case. Thielking's failure to set forth his qualifications with his appraisal and petitioner's failure to show that he was qualified cause us to reach the same conclusion here--petitioner's common stock was not appraised by an "independent appraiser" within the meaning of section 401(a)(28)(C) .

In the administrative record it is mentioned that Thielking stated to respondent's agent that he has been preparing appraisals for petitioner and other companies for many years. We note that the Hollen case shows that Thielking

**[*23]** prepared an ESOP securities appraisal in at least one other instance. Even if Thielking had performed numerous appraisals over the years, there is no evidence in the administrative record in this case showing the type of business and the nature of the appraisals that he performed. Although petitioner contends that Thielking has extensive experience as an "appraiser" there is no evidence showing that he was qualified to appraise the common stock of petitioner.

Finally, petitioner raises the issue of substantial compliance by arguing that Thielking was in other respects not disqualified by the statutory requirements. In particular, petitioner contends that Thielking was not a party in donor transactions in the property being appraised, a donee of the property, or an employee of the donors or donees and that he performs most of his appraisals for entities other than petitioner.

In Bond v. Commissioner, 100 T.C. 32 (1993), this Court considered whether there was substantial compliance with respect to certain charitable contributions under section 170. In Bond, one of the shortcomings of the taxpayer's claim to a contribution deduction was the failure to provide the appraiser's qualifications along with the appraisal. The taxpayer in Bond, however, provided the appraiser's qualifications at the beginning of the audit examination process. This Court held that there was substantial compliance

**[\*24]** because the failure to provide the appraiser's qualifications was remedied and "the [qualification] requirements are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business, they may be fulfilled by substantial, if not strict compliance." Id. at 41.

In Bond, the essence of the statute was verification or substantiation that a contribution was made and the regulations under section 170 were more procedural or directory. Section 401(a)(28)(C) provides that any valuation of securities not readily tradable on an established securities market must be performed by an "independent appraiser" and that the standards for appraisers are similar to those set forth in the regulations promulgated under section 170(a)(1). Accordingly, the essence of the statute involved here is that the appraiser be independent, which does not inherently subsume the requirement that the appraiser be qualified. The qualifications required of an appraiser are in the section 170 regulations and appear to be more procedural and directory as already decided in Bond.

On the basis of the administrative record, it appears that Thielking was not independent as he was the author and preparer of most of the trust records and returns. Additionally, we are not able to find on the administrative record that he is qualified and see that as another difference from the holding in the Bond case. A

[*25] more important difference from <u>Bond</u>, however, is that the question of Thielking's qualifications is only one of several bases and justifications underlying respondent's determination that petitioner's plan was not qualified and, in turn, that its trust was not exempt. Under those circumstances, we continue, in our analysis of whether respondent's determination was an abuse of discretion, to give weight to the fact that petitioner has not shown that Thielking was qualified and that he failed to attach appropriate information to his appraisal.

## Conclusion

In this case two types of statutory noncompliance with respect to amending the plan occurred. Some failures to comply before the 2001 plan were cured in that plan, and others were not. With respect to those that were cured, the lapses of time when the plan was not in compliance extended from three to more than eight years. Failure to amend the plan for these periods does not show the exercise of reasonable diligence. See <u>Pawlak v. Commissioner</u>, T.C. Memo. 1995-7, slip op. at 21-22.

Petitioner contends that the plan was, in most instances, amended to comport with the statutes and that, in essence, no employee benefits were affected during the period within which there was a failure to amend. As observed earlier, Congress established the writing requirement so that employees, by examining the

**[*26]** plan document, can determine exactly what their rights and obligations are under the plan.

Additionally, petitioner complains that the revocation is retroactive in effect. We cannot substitute our judgment for respondent's judgment with respect to these discretionary acts. Petitioner has not shown that respondent abused his discretion in retroactively revoking the plan. Therefore, petitioner's argument must fail. The enactment of the various statutes necessitated the amendment of petitioner's plans within the applicable compliance dates, and petitioner's failure to amend was not reasonable. That, coupled with the failure of the appraiser to state or petitioner to show that he was independent and/or qualified causes us to hold that there has been no abuse of discretion in respondent's determination that 1995 and subsequent plan years are not qualified under section 401(a) and that the related trust is not exempt under section 501(a).

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.